## SHIZAS *v.* CITY OF DETROIT.

1. Eminent Domain—Inherent Power of Sovereignty.
   The power of eminent domain is inherent in every sovereign government and does not depend for its existence on constitutional provisions.

2. Same—Constitutional Law.
   The Constitution may limit and direct the exercise of the sovereign power of eminent domain.

3. Same—Condemnation for Public Use Only.
   Private property may not be taken under the power of eminent domain for other than a public use.

4. Same—Incidental Use for Private Purposes.
   Space within buildings, erected for a public use on property sought to be taken under the power of eminent domain, which is not required for the purposes to which the building is devoted may properly be rented to private parties and such use may properly be held to be merely incidental to the main object served.

5. Same—Private Use a Part of the Purpose for Seeking to Condemn Land.
   The power of eminent domain may not be exercised where the intention to confer a private use or benefit forms the purpose or a part of the purpose of the proceeding or taking.

6. Same—Statutes—Partial Use for Private Purposes.
   A statute authorizing a taking of private property for uses partly public and partly private is void, where the private use is so combined with the public use that the 2 cannot be separated.

---

References for Points in Headnotes
[1] 18 Am Jur, Eminent Domain § 7.
[2] 18 Am Jur, Eminent Domain §§ 3–5.
[3–7] 18 Am Jur, Eminent Domain §§ 4, 34, 35.
[4–7] 18 Am Jur, Eminent Domain §§ 41–43.
[4–7] Eminent Domain: Combination of public and private uses or purposes. 53 ALR 9.
[8] 14 Am Jur, Costs § 91.

7. SAME—STATUTES AUTHORIZE CONDEMNATION IN PART FOR PRI-
VATE PURPOSES—DUE PROCESS.

Statute providing for condemnation of property to be used
in part for off-street parking facilities and in part for rental
for private businesses, which purposes were so interwoven
as to be inseparable would result in condemnation of private
property for other than a public use, a purpose not sanctioned
by the Constitution, and involves a taking of property with-
out due process of law in violation of the Federal and State
Constitutions notwithstanding rentals were to be credited
to the parking facility (US Const, am 14; Mich Const 1908,
art 2, § 16; PA 1947, No 286).

8. COSTS—PUBLIC QUESTION—CONSTRUCTION OF STATUTES.

No costs are allowed in proceeding wherein invalidity of a
statute authorizing condemnation of land by cities for park-
ing facilities and leasing of a portion for stores is deter-
mined, a public question being involved (US Const, am 14;
Mich Const 1908, art 2, § 16; PA 1947, No 286).

Appeal from Wayne; Brennan (John V.), J. Sub-
mitted January 17, 1952. (Docket No. 72, Calendar
No. 45,339.) Decided April 7, 1952.

Bill by Andrew Shizas and another, doing business
as Andrew Shizas & Company, against City of De-
troit to restrain certain condemnation proceedings
and for other relief. Bill dismissed on motion.
Plaintiffs appeal. Reversed and remanded for fur-
ther proceedings.

*Irwin I. Cohn* (*Avern L. Cohn* and *John Sklar,* of
counsel), for plaintiffs.

*Paul T. Dwyer,* Acting Corporation Counsel, and
*Vance G. Ingalls,* Assistant Corporation Counsel, for
defendant.

CARR, J. This suit was brought in circuit court to
enjoin the condemnation of certain property in the
city of Detroit, the area in question being described
as bounded by Monroe, Randolph, Bates and Farmer

streets. The bill of complaint alleged that the proceeding was being taken by defendant pursuant to and in reliance on PA 1947, No 286,* that said act is for various reasons unconstitutional, and that resolutions adopted by the common council of the city in accordance therewith are likewise invalid. It was further set forth in the pleading that plaintiffs were residents and taxpayers of the city of Detroit, and that they were doing business in leased premises on Monroe street. They asserted that irreparable injury would result to them if the property is condemned.

Defendant filed its answer to the bill of complaint denying the invalidity of the statute and of the proceedings taken thereunder and that plaintiffs were entitled to the relief sought by them. A motion to dismiss on the ground that the facts pleaded were not sufficient to establish an equitable cause of action was incorporated in the answer. Subsequently, on hearing, such motion was granted, the trial court concluding that the statute is constitutional and that the proceedings taken thereunder were not invalid for the reasons urged by plaintiffs. An order was accordingly entered dismissing the bill of complaint, and plaintiffs have appealed.

The statute in question, PA 1947, No 286, is entitled:

"An act to authorize cities to acquire and operate automobile parking facilities for the use of the public; to provide the manner of acquiring and financing the same; and to authorize the leasing of space therein for other uses."

The first section provides, in accordance with the object indicated by the title, that any city may acquire, extend and operate, automobile parking facili-

* CL 1948, § 141.161 *et seq.* (Stat Ann 1949 Rev § 5.2426[1] *et seq.*).

ties for the use of the public, and that any such project may be financed by the issuance of revenue bonds as provided in PA 1933, No 94, as amended.* Provision is made for the acquiring of property by purchase or condemnation, and for the operation of any parking facility jointly with such facilities at other locations within the municipality. The establishment of such facility for the public use is authorized without the approval of the electors, notwithstanding any statutory or charter provision to the contrary. Section 2, which is of particular moment in the instant case, reads as follows:

"The legislative body of the city may lease for purposes other than the parking of automobiles, upon such terms and for such periods as it shall deem advisable, any portion of the ground and basement floor space in any structure acquired hereunder, but not to exceed 25 per centum of the total floor area of the entire structure, if it shall deem such leasing to be beneficial in connection with the acquirement and/or operation of such facilities. If a structure is designed for the parking of automobiles on the roof, such roof area shall be considered as a part of the floor area of the structure. The income from any such lease shall be deemed a part of the revenues of the facilities: Provided, however, That no business involving the servicing, repairing or the furnishing of supplies for motor vehicles other than the parking of such vehicles and the delivery thereof shall be dispensed or furnished at or in connection with any municipal parking facility."

Following the enactment of the statute, the common council of the city adopted ordinance 213–E, effective January 1, 1948, providing for the creation of a municipal parking authority for the general supervision of all municipal facilities for the parking of

---

* CL 1948, § 141.101 et seq., as amended by PA 1949, No 244 (Stat Ann 1949 Rev and Stat Ann 1949 Cum Supp § 5.2731 et seq.).

automobiles and to make recommendations to the common council and the mayor pertaining thereto. The bill of complaint averred that on November 4, 1949, the municipal parking authority created pursuant to the ordinance submitted to the council its report, accompanied by recommendations and a suggested ordinance. This report proposed, among other things, that the site, above referred to, be condemned and a structure erected thereon containing space for the parking of 780 motor vehicles and also for 22 retail stores on the ground floor. It was estimated in such report that the total cost of the facility would be $3,221,000, with an annual gross revenue of $553,900 consisting of $183,000 by way of store rentals and $370,900 from parking fees. The total operating cost was estimated at $293,800 leaving a net revenue in the sum of $260,100.

It does not appear that any action was taken on the proposed ordinance, which set forth in detail provisions for financing the project in accordance with PA 1933, No 94, as amended, above cited. However, on February 14, 1950, the common council adopted a resolution directing the corporation counsel to prepare a resolution for the condemnation of the property bounded by Monroe, Farmer, Bates and Randolph streets "for a parking structure as outlined in the report submitted by the municipal parking authority," and to submit such resolution for consideration. Apparently this was done, and under date of May 16, 1950, the council adopted a resolution providing for the acquisition of the property in question for "off-street automobile parking facilities and other municipal purposes." Said resolution referred to the prior action taken on February 14th whereby approval had been given to "the acquisition of land for off-street automobile parking facilities and other municipal purposes."

The resolutions of the common council, construed together, indicate the purpose for which it undertook to authorize and direct the condemnation proceeding of which plaintiffs complain. It appears that the project contemplated included the construction of a building as recommended by the municipal parking authority, in which there would be facilities for parking 780 motor vehicles, with 22 stores on the first floor of the structure to be rented for the purpose of producing revenue. No claim is made by plaintiffs that the aggregate floor space occupied by the proposed stores would exceed 25% of the total area. Neither is it claimed by defendant that such space could not be used for the parking of motor vehicles or that it would be, in any sense of the term, "excess space." It is not disputed that the demand for parking facilities in this section of Detroit greatly exceeds the provision made therefor under the plan of the municipal parking authority. It is defendant's theory, however, that since the total area assigned to the construction of retail stores is materially less than that set aside for the use of the public, and does not exceed the 25% limitation imposed by the statute, it should be regarded as merely incidental to the public use sought to be served. It may be noted also in this connection that while the revenue from the rents derived from the stores is to be credited to the facility, no claim is made that the public project cannot be effectuated without the obtaining of revenue therefor in the manner indicated.

The attack on PA 1947, No 286, is directed in the main at the provisions of section 2, above quoted. On behalf of plaintiffs it is insisted that the legislature has undertaken to authorize the condemnation of private property for 2 separate and distinct uses, one public and the other essentially private in character. The argument is advanced that this is inconsistent with the nature of the power of eminent do-

main. Such power is inherent in every sovereign government, and does not depend for its existence on constitutional provisions. It has, however, been repeatedly recognized by the courts that such provisions may limit and direct the exercise of the sovereign prerogative It has been recognized generally, also, that under such restrictions, either expressed or implied, private property may not be taken for other than a public use. In 18 Am Jur, pp 657, 658, it is said:

"It is to be noted that few, if any, of the State Constitutions in terms prohibit the taking of property by authority of the State for uses that are not public. The characteristic provision found in the Constitutions of the several States, and in that of the United States as well, is to the effect that property shall not be taken for the public use without just compensation. Nevertheless, while the courts have not been in agreement on the precise meaning of the term 'public use,' it has been held, without a single dissenting voice, that the State does not have power to authorize the taking of the property of an individual without his consent for the private use of another, even on the payment of full compensation."

And in 29 CJS, pp 781, 782, appears the following summarization with reference to the effect of provisions in the State and Federal Constitutions:

"As appears in section 2, *supra,* the right of eminent domain exists independently of constitutional provisions; it is not conferred, but may be recognized, limited or regulated, by the constitutions, which, aside from requiring that the use for which the power is exercised be a public one, or that compensation be made, or both, operate only on the mode of exercising the right."

This Court has heretofore indicated its approval of the basic principles summarized in the above quo-

tations. *Hendershott* v. *Rogers,* 237 Mich 338; *In re Brewster Street Housing Site,* 291 Mich 313, 334.

The language of the statute here in question undertakes to give absolute authority to the legislative body of the city to enter into leases that it may deem beneficial, upon such terms and for such periods of time as it shall consider expedient. Confining the right to lease to the basement and ground floor space indicates that business places there located were considered more desirable than such space on the upper floors of the structure. Undoubtedly higher rentals may be obtained therefor than for other space, a situation which tends to emphasize the fact that the purpose of permitting leasing was to obtain revenue. In effect, the legislature has sought to authorize the acquiring of property by a city through condemnation proceedings to be used in part for off-street automobile parking purposes and in part for renting to those who may wish to conduct retail businesses. The restriction against any business involving the servicing, repairing, or furnishing of supplies for motor vehicles suggests the absence of an intent to encourage the use of the parking facilities by the public. In view of the traffic conditions existing in the locality concerned, as indicated by the record, it is quite probable that encouragement of such nature was deemed unnecessary.

The fact that the revenue derived from the contemplated stores is required to be credited to the parking facility does not mean that the property thus rented is devoted to a public use within the meaning of the general principles of law applicable to the exercise of the power of eminent domain. Neither does the fact that the legislature has seen fit to limit the amount of floor space that can be rented to 25% of the total render such nonpublic use merely an incidental one. It is significant that the act does not permit merely the leasing of space not

necessary to the public service, nor is it limited to space not adapted to the public use. The power granted to the municipality, if valid, may be exercised without reference to the public requirements as to parking facilities.

Counsel for defendant cite and rely on the decision of this Court in *Cleveland* v. *City of Detroit,* 322 Mich 172. There the plaintiffs sought to enjoin the city from condemning property to be used for the construction of subsurface bus terminals, to be used in connection with the defendant's street railway system. The question was there involved as to the extent of the property rights that defendant might acquire. On behalf of the plaintiffs it was contended that the proposed terminals would require use of only the subsurface and such portions of the surface as might be necessary for ingress and egress. In effect, defendant was accused of intending to construct a building of proportions greater than necessary for street railway purposes, and it was insisted that any such use would not be a public one, and that to allow defendant to proceed would permit the taking of property without due process of law in violation of the 14th amendment to the Federal Constitution and article 2, § 16, of the State Constitution. This Court declined to hold that real estate may be divided "horizontally as well as vertically into segments of independent use and ownership." It was also pointed out that there was no proof in the case that defendant's needs for the intended public use would not be greater than as alleged by plaintiffs, or that any part of the property sought to be acquired would be used for a nonpublic purpose. Attention was directed to the fact that the resolution of the common council authorizing condemnation expressed the sole purpose to be the projected use for bus terminals in connection with the street railway system. The claim of the plaintiffs apparently

rested on the theory that the construction of the subsurface terminals would result in space within the buildings to be erected that would not be required for the purposes of the street railway system, and that such space might be rented. Such a use might properly be held to be merely incidental to the main object served. See *Dyer* v. *Township of Burns,* 228 Mich 513; *Detroit International Bridge Co.* v. *American Seed Co.,* 249 Mich 289, 296. In the case at bar, however, the statute, as above noted, expressly allows the condemnation of property to be used in part for an nonpublic purpose, and the resolution of the common council providing for the condemnation made reference to such use as set forth in the report of the municipal parking authority.

In *Berrien Springs Water-Power Co.* v. *Berrien Circuit Judge,* 133 Mich 48 (103 Am St Rep 438), the Court held unconstitutional an act providing for the condemnation of land for the purpose of improving navigation and creating a water power which, when established, might be used for either public or private purposes. In reaching the conclusion indicated, it was said:

"The fact that, under this law, land cannot be taken until the public necessity therefor has been determined by the tribunal to whose determination that matter is by the Constitution submitted, does not answer the objections to its constitutionality. The question submitted to that tribunal will be substantially as follows: Does public necessity require that the land specified in relator's petition shall be taken to so improve the navigability of St. Joseph river that relator can operate thereon a transportation business and can obtain thereby the water power it desires? The question of public necessity thus submitted is not confined to the public necessity requiring the improvement of the navigability of the river, but extends also to the necessity requiring the construction of a water power, which, as has already

been shown, this Court is bound to declare private in its character. The constitutional tribunal for condemning land cannot find that public necessity requires a taking for private purposes. *Ryerson* v. *Brown,* 35 Mich 333 (24 Am Rep 564). Yet by the act under consideration that tribunal is authorized to make such a finding, and, by making it, take property for a private purpose."

In *Kessler* v. *City of Indianapolis,* 199 Ind 420 ·(157 NE 547, 53 ALR 1), the plaintiff sued to enjoin the city and its board of park commissioners from taking, under the power of eminent domain, a small parcel of land within the city. It was in substance the claim of the plaintiff that the real purpose in taking it was to aid an adjoining property owner. The resolution providing for condemnation recited that the property was to be acquired for "park purposes." It was contended on behalf of defendants that such recital was conclusive on the court. It was held, however, that inquiry might be made into surrounding facts and circumstances tending to show the real use that was contemplated. It was declared that the power of eminent domain may be exercised only for public purposes, and that the taking of private property for private use violates the constitutional rights of the owner. The Court recognized that a use of such public character as to justify the exercise of the power of eminent domain did not lose such character by the fact that an incidental private use or benefit might result. Further discussing the matter, it was said:

"Where, however, the intention to confer a private use or benefit forms *the purpose, or a part of the purpose,* of the proceeding or taking, the power of eminent domain may not be exercised. *Harding* v. *Goodlett* (1832), ·3 Yerg (Tenn) 41 (24 Am Dec 546); *Columbus Water Works Co.* v. *Long* (1898), 121 Ala 245 (25 So 702); *State, ex rel. Harris,* v. *Su-*

*perior Court* (1906), 42 Wash 660 (85 P 666, 5 LRA
NS 672, 7 Ann Cas 748); *Gaylord* v. *Chicago Sani-
tary District* (1903), 204 Ill 576 (68 NE 522, 63 LRA
582, 98 Am St Rep 235); *Chicago & Northwestern R.
Co.* v. *Galt* (1890), 133 Ill 657 (23 NE 425, 24 NE
674); *Minnesota Canal & Power Co.* v. *Koochiching
Co.* (1906), 97 Minn 429 (107 NW 405, 5 LRA NS
638, 7 Ann Cas 1182). It is only where the public
and private purposes may be separated (and they
cannot be separated in the case at bar) that the pro-
ceeding may be permitted to be taken as to that part
which is public in character. *Miller* v. *Town of Pu-
laski* (1909), 109 Va 137 (63 SE 880, 22 LRA NS
552); *State, ex rel. Harlan,* v. *Centralia-Chehalis
Electric Railway & Power Co.* (1906), 42 Wash 632
(85 P 344, 7 LRA NS 198); *City of Tacoma* v. *Nis-
qually Power Co.* (1910), 57 Wash 420 (107 P 199).
It appears from our review of the principal testi-
mony that there was evidence tending to show that
the strip of ground was desired (though possibly not
immediately needed) by the city for a use that was
unquestionably a public use, but such testimony also
shows that it was desired by the board of park com-
missioners to take the property for the private use
of the owner of lot 11."

Judgment rendered by the trial court on motion
based on the alleged insufficiency of plaintiff's proofs
was reversed, and the case remanded for further
proceedings. Likewise in *Miller* v. *Town of Pulaski,*
109 Va 137 (63 SE 880, 22 LRA NS 552), it was held
that a statute which permitted the condemnation of
property to be used in supplying the inhabitants of
a town with water and electric lights, admittedly a
public use, and also supplying private persons, com-
panies and corporations with electric power, was un-
constitutional in its entirety, since the public and
private purposes could not be separated.

In *State, ex rel. Puget Sound Power & Light Co.,*
v. *Superior Court for Snohomish County,* 133 Wash

308 (233 P 651), the proceeding was brought to condemn an easement for an electric transmission line. The trial court refused to find public use and necessity, and the plaintiff reviewed by certiorari the judgment entered. The facts in the case indicated that the appellant was devoting its facilities to both public and private use and that while serving the public at the peak hour it had actually devoted to private uses 25 to 30% of its supply of electric current. Commenting on the situation, it was said:

"As we view it, this is not a case of providing for a public use and, when the maximum for that purpose is not required, devoting it, or a part of it, to some other purpose so as to prevent waste, but a case of actually devoting one-fourth of the total available supply to private use at the same time of the highest demand for public service and still have over and above the 2 combined a supply of approximately 1/6 of the total present available supply. Under such circumstances we know of no sound reason for holding, nor any case judicially declaring, the contemplated use of additional property to be really public, hence there is no necessity shown for the taking of the property sought to be acquired.

"Plaintiff lays considerable stress on the following words in the findings: 'But such transmission lines would not be constructed in any other manner for the transmission of all of such power than they would be constructed if wholly devoted to transmitting power used wholly for public uses.' These words immediately follow the statement 'that the transmission lines for which the easement is sought to be condemned herein would be used to transmit power for use in operating street railways, interurban lines, street lighting, and lighting in homes under franchise of the petitioner and also for operating manufacturing plants,' which altogether constitute one finding as made by the court. Because of the language first above quoted, it is argued, in effect, that, since the same servitude would be imposed on the land if

all of the power transmitted over the lines thereon was devoted to a really public use, it is immaterial to the rights of the parties if a part of the power transmitted be devoted to a private use. The argument is not convincing because it neither comprehends nor answers the vital question in the case. The real test or question is, what is the contemplated use of the power intended to be transmitted over lines for the erection and maintenance of which the property is sought to be taken? We think it must be held that the conclusion of the trial court was right."

See, also, *Minnesota Canal & Power Company* v. *Koochiching Company,* 97 Minn 429 (107 NW 405, 5 LRA NS 638, 7 Ann Cas 1182); *Chicago & Northwestern R. Co.* v. *Galt,* 133 Ill 657 (23 NE 425, 24 NE 674); *Kaukauna Water Power Company* v. *Green Bay & Mississippi Canal Co.,* 142 US 254 (12 S Ct 173, 35 L ed 1004).

Counsel for defendant cite and rely on *Bush Terminal Co.* v. *City of New York,* 282 NY 306 (26 NE2d 269). That decision, however, did not involve the right to condemn property. It appears that the Port of New York Authority owned an entire square block of land in the borough of Manhattan, city of New York. It entered into an agreement with 8 trunk line railroads entering the district to construct an "inland terminal building" upon the land, and to lease facilities therein to the railroads for terms of 5 years with the privilege of renewals. In carrying out the agreement, the Port Authority demolished the old buildings on the property and erected a modern building 16 stories in height, designated as "inland terminal No 1." By act of the legislature the Port Authority was authorized to enter into an agreement with the city to pay an annual tax not in excess of the sum last paid upon the property prior to the time of its acquisition by the Authority. The validity of such contract and the right of the Port

Authority to construct the building in question were challenged by the plaintiffs. The court in its opinion pointed out the economic benefits resulting to the public from the construction of inland terminals, and that the revenue from each such project was required to be sufficient to pay the expense of operation and maintenance as well as the interest and sinking fund requirements of the bonds issued. In discussing the matter further, it was said:

"The evidence established and the court at Special Term has found that without the upper stories it would have been economically impossible to construct the Inland Terminal Station. Such a terminal for efficient operation should occupy a full block of land, and land in New York is too costly to be used economically for such a purpose alone. The court has found that without the addition of upper stories which might be utilized for revenue producing purposes, 'the Port Authority would have been unable to borrow the funds needed to finance the erection of the Inland Terminal Station; and consequently would have been wholly unable to carry out and effectuate the mandate of the aforesaid Compact and Comprehensive Plan.'

"The construction of a great building, over the space used for the freight terminal, in order to obtain revenue, might transcend the powers of the Authority if the erection of the freight terminal alone would have been feasible, but the mandate and the express grant of power to the Port Authority to construct terminals include as an incident the power to use appropriate means to carry out the mandate. Acts performed in carrying out a legislative mandate, as an incident to the exercise of a general power conferred by the legislature, are not *ultra vires* where they were within the contemplation of the legislature when it granted the general power."

It will be noted that the question at issue was the use of the property owned by the Port Authority.

It involved the right to lease space not required for the rendition of public service. The value of the land on which the building was constructed required, for obvious economic reasons, a structure of a size and character consistent therewith, and the public service contemplated could not be otherwise furnished. The question was whether the action of the defendant corporate body was *ultra vires*. As before noted, an attempted exercise of the sovereign power of eminent domain was not involved. The facts and issues raised clearly distinguish the case from the situation presented in the matter now before us.

The general rule with reference to the validity of a statute undertaking to authorize the exercise of the power of eminent domain for purposes partly public and partly private is, we think, well summarized in 29 CJS, p 828, where it is said:

"A statute authorizing a taking of private property for uses partly public and partly private is void, where the private use is so combined with the public use that the 2 cannot be separated."

PA 1947, No 286, in terms provides for condemning property to be used in part for off-street parking facilities and in part for rental for private businesses. Such purposes are so interwoven that they cannot be separated. The provisions of section 2, which, as before pointed out, were followed by the common council in authorizing the condemnation of the property in question for the purposes set forth in the report of the municipal parking authority, are open to objections on constitutional grounds. The condemning of private property for other than a public use is not sanctioned by the Constitution of this State. On the contrary, it involves the taking of property without due process of law in violation of article 2, § 16, of the State Constitution (1908), and

the 14th amendment to the Federal Constitution. *Cincinnati* v. *Vester,* 281 US 439 (50 S Ct 360, 74 L ed 950); *Carroll* v. *City of Cedar Falls,* 221 Iowa 277 (261 NW 652); *Cain* v. *Aspinwall-Delafield Co.,* 289 Pa 535 (137 A 610); *Edwards* v. *Myers,* 99 Ohio St 96 (124 NE 128).

Plaintiffs' claims with reference to the validity of certain provisions of section 1 of the act do not require specific discussion. They are, we think, sufficiently answered by prior decisions of this Court. *City of Jackson* v. *Consumers Power Co.,* 312 Mich 437 (62 PUR NS 48); *Wayne Village President* v. *Wayne Village Clerk,* 323 Mich 592 (8 ALR2d 357); *Cleveland* v. *City of Detroit,* 324 Mich 527 (11 ALR 2d 171). Objections to the proceeding based on the alleged personal interests of 2 members of the municipal parking authority have no bearing in the case as now presented. The Court is concerned with the action of the common council rather than with the motives of the members of the commission submitting the recommendation.

A decree will enter in this Court reversing the order of the trial court and remanding the case for such further action or proceedings as may be considered expedient. A question of public concern being involved, no costs are allowed.

NORTH, C. J., and DETHMERS, BUTZEL, BUSHNELL, SHARPE, BOYLES, and REID, JJ., concurred.