[S. F. No. 18982.   In Bank.   Feb. 3, 1955.]

CITY AND COUNTY OF SAN FRANCISCO, Petitioner, v. HARRY D. ROSS, as City and County Controller, etc., Respondent.

Dion R. Holm, City Attorney, and John Elmer Barricklo, Deputy City Attorney for Petitioner.

Jesse H. Steinhart, B. J. Feigenbaum, John H. Steinhart and Joseph J. Carter, for Respondent.

SHENK, J.—This is a proceeding in mandamus. The alternative writ issued. The respondent Harry D. Ross is the controller of the petitioning city and county and upon request refused to certify to the availability of funds in the city's off-street parking bond fund for the acquisition by eminent domain of a proposed off-street parking garage site between Ellis and O'Farrell Streets in downtown San Francisco. By this proceeding the city seeks to compel such certification.

The electorate of the city approved a parking bond issue in the sum of $5,000,000 in 1947. The purpose of providing this fund was to pay for "the cost of public parking lots, storage space, garages, single or multilevel structures, and other off-street parking facilities on, under and above the surface of any property, including public parks, squares, lands, easements or rights of way to be acquired by purchase or condemnation, together with buildings, structures, equipment, approach roads, entrances, exits, fencing, off-street parking meters, and other works, property or structures for the accommodation of automotive vehicles, and necessary or convenient for adequate parking facilities, to relieve the congestion and to facilitate traffic in the metropolitan district of the City and County of San Francisco, provided that all lands and sites so acquired be subject to the approval of the Planning Commission of the City and County of San Francisco." Approximately $4,000,000 remains unallocated in this fund.

On October 3, 1949, purporting to act under the Parking Law of 1949 (Sts. & Hy. Code, §§ 32500-33552) the city duly took the necessary steps to create a Parking Authority. The Authority, with the sanction of the city planning commission, approved the site here involved. The board of supervisors determined the site to be convenient and necessary and requested the Authority to submit a proposed working agreement between it and the city. Such an agreement was submitted and executed. Under the agreed plan the city was to acquire by eminent domain the desired site and to lease it to private individuals who would build a structure thereon in accordance with the city's specifications and operate parking and other facilities therein. Acting on the Authority's recommendation the board of supervisors passed an ordinance requesting the respondent controller to certify the availability of funds for the acquisition of the site under the authority of the San Francisco city charter and eminent domain provisions of the general law.

The controller's refusal to act favorably in response to the request is based on his contention that the money in the fund cannot lawfully be used for the expenditure as it is proposed to be applied. The charter of the City of San Francisco requires the approval of the respondent before money may be disbursed. (Charter of San Francisco, § 86, par. 1.)

There are several special statutory procedures under which the city could proceed and by eminent domain acquire property to be leased to and operated by private individuals. (Vehicle Parking District Law of 1943, Sts. & Hy. Code, §§ 31500-31907; Parking District Law of 1951, Sts. & Hy. Code. §§ 35100-35705; Sanitation, Sewer and Water Revenue Bond Law of 1941, Gov. Code, §§ 54300-54672.) The city created its existing Parking Authority under the Parking Law of 1949. (Sts. & Hy. Code, §§ 32500-33552; see also Municipal Parking Revenue Bond Law of 1949, Sts. & Hy. Code, §§ 33800-34859. But other than the establishment of the Authority, the city has not availed itself of any of the various special legislative acts and does not purport to proceed in any manner provided for in those statutory provisions. It is assuming to proceed under its general power of eminent domain to accomplish the acquisition of the property (Code Civ. Proc., § 1238.1), and thereafter to proceed under its claimed power to effect the lease of its properties to private interests.

The city's right to proceed under any one of several alternative methods for acquiring the property by the exercise of eminent domain is not challenged. (See *City of Oakland* v. *Parker*, 70 Cal.App. 295 [233 P. 68]; *County of Los Angeles* v. *Rindge Co.*, 53 Cal.App. 166 [200 P. 27].) But it must justify its actions under whatever procedure it undertakes to accomplish its purpose. There are no express provisions in its charter conferring upon the city the right to condemn property for the purpose stated herein. ■ A municipal corporation has no inherent power of eminent domain and can exercise it, if at all, only when expressly authorized by law. (*Alexander* v. *Mitchell*, 119 Cal.App.2d 816, 821 [260 P.2d 261]; *Mackay* v. *City of Los Angeles*, 136 Cal.App. 180, 183 [28 P.2d 706]; *City of Los Angeles* v. *Koyer*, 48 Cal.App. 720, 725 [192 P. 301]; 10 Ruling Case Law 196, and cases there cited.) ■ In such event its exercise is not to be classed as a municipal affair but instead is a matter of statewide concern. (*Alexander* v. *Mitchell, supra,* 119 Cal.App.2d 816, 820; *City of Tacoma* v. *State*, 4 Wash. 64 [29 P. 847].) This conclusion is inescapable in the

present case as the city itself purports to find its power of condemnation in the general law of the state. (Code Civ. Proc., § 1238.1.) The city, then, must conform to the general law in acquiring the proposed property.

The controller's refusal to certify the availability of funds is based on his contention that under the general law the city cannot condemn private property to be immediately leased to private parties for use as a private venture. Article 1, section 14 of the Constitution restricts the exercise of eminent domain to specific purposes not including the contemplated use in the present case unless it may qualify as a "public use." Section 1238.1 of the Code of Civil Procedure authorizes the city to condemn property for off-street parking facilities "for public use." The controller insists that the city's admitted intention to refrain from directly controlling rates to be charged to customers and from otherwise regulating the operation of the proposed facility constitutes the operation of the garage as one in the nature of a private business and not as one for "public use" for which eminent domain could be used. This is the basic issue involved.

The question appears to be a novel one in this state. It has been decided adversely to the city's contention in a recent decision by the Supreme Court of the State of Rhode Island. In *Opinion to the Governor* (1950), 76 R.I. 365 [70 A.2d 817], the court held unconstitutional a statute authorizing a development authority to acquire land by eminent domain for a marina and auditorium to be operated by a private individual under a lease from the authority. After holding that the operation of a marina might be for the public benefit the court stated that the statute "would permit the spending of public money and the exercise of the right of eminent domain to acquire private property ostensibly for a public purpose but actually for profit in the operation of the marina as a private enterprise. . . . To permit such authority to lease the entire project to some private person, who thereafter would operate it for his own profit by fixing the fees and charges for its use and for services rendered, without regulation in the public interest as a public utility, would at once make it a private enterprise and would remove the element of primary public use or purpose which is essential if the act by which the project is authorized is to be considered valid."

In *Berman* v. *Parker*, 348 U.S. 26 [75 S.Ct. 98, 99 L.Ed. ——], decided by the Supreme Court on November 22, 1954, the District of Columbia Redevelopment Law of 1945 (60

Stats. 790, D.C. Code 1951 §§ 5-701 to 5-719) was held valid. That law provided for the redevelopment of substandard housing areas through the acquisition of all private property within the area by a governmental agency in condemnation proceedings. Under the provisions of the act the agency might then sell or lease the property to private parties for its redevelopment. However the decision in that case affords no aid to the city in the present case. The act there involved provided for a systematic plan to assure redevelopment in a manner to protect the public health, safety, morals and welfare. It directed the National Capital Planning Commission to develop a comprehensive general plan of the district including "a land-use plan" which designated land for use in such categories as "housing, business, industry, recreation, education, public buildings," and public reservations. In making its plans the commission was required to consider "standards of population density and building intensity," the amount or character or class of any low-rent housing and maximum rentals chargeable. The agency which acquired the land could lease or sell portions not devoted to such purposes as streets, utilities, schools and recreational facilities, but only under agreements which provided that the lessees or purchasers would carry out the redevelopment plan and that "no use shall be made of any land or real property included in the lease or sale nor any building or structure erected thereon" which did not conform to the plan.

It is the stringent controls maintained over the properties sold or leased to private parties which distinguishes the Berman case from the present case.  ▮  Such controls are designed to assure that use of the property condemned will be in the public interest. In the present case these controls are lacking.

The same reasoning is apparent in decisions in this state wherein the courts have attached significance to the control retained by governing bodies as indicative that public lands leased to private individuals were still serving a public purpose. In *City of Oakland* v. *Williams*, 206 Cal. 315 [274 P. 328], it appeared that tidelands were granted by the state to the city of Oakland for public purposes. In upholding a lease of some of that land to a private operator to conduct a warehouse thereon, the court set forth at length the terms of the lease which would insure performance by the lessee of the uses and purposes specified for which the city had been granted the lands. In *Redevelopment Agency* v. *Hayes*,

122 Cal.App.2d 777 [266 P.2d 105], the court held that the taking of land by eminent domain for public use was proper and that the intention that the land would be returned to private ownership but ''subject to restrictions protecting the public use'' did not make it any the less a public use.

A résumé of the statutory procedures under which the city might have acted had it chosen to do so, indicates a clear legislative policy requiring governmental control of rates and charges to assure the fulfilling of a public need. In Vehicle Parking District Law of 1943 (Sts. & Hy. Code, §§ 31500-31907) a vehicle parking district is authorized to acquire land by condemnation and to construct garages thereon for parking purposes. The managing board of the district may lease the property to a private operator, but in such a case section 31788 of the code provides: ''The maximum rentals, fees, and charges to be collected by the operator shall be fixed by the board after public hearing following such notice as the board prescribes, and shall be recited in the lease or franchise. No higher rentals, fees or charges shall be collected by the operator without amendment of the lease or franchise agreed to by the board after like public hearing.'' The Parking District Law of 1951 (Sts. & Hy. Code, §§ 35100-35705) authorizes the creation of parking projects in similar manner and in language almost identical with that set out above and requires that rates to be charged be controlled, regulated and fixed by the governing body. (Sts. & Hy. Code, § 35569.)

Under the Parking Law of 1949 (Sts. & Hy. Code, §§ 32500-33552) the Parking Authority is given the power to provide for the control of rates to be charged by a private party operating under a lease where the revenue from such operation is to be used to retire a bond issue. (Sts. & Hy. Code, § 33116.) The Municipal Parking Revenue Bond Law of 1949 (Sts. & Hy. Code, §§ 33800-34859) provides a method of financing public parking projects by means of revenue bonds, which projects may be leased. Section 34400 provides: ''The legislative body shall fix the rates, fees, and other charges for all projects, services, or facilities furnished, acquired, constructed, or completed pursuant to this part. . . .'' To a similar effect see the Sanitation, Sewer and Water Revenue Bond Law of 1941 (Gov. Code, §§ 54300-54672.)

The controller further contends and it so appears that the city intends to allow a portion of the ground floor frontage of the proposed building to be leased and occupied by

retail stores. While the area of total floor space to be occupied by such commercial activity is estimated by the city to be no more than 4 per cent thereof, it is contended that to this extent there is a clear taking of private property for private purposes and so interwoven with an otherwise questionable exercise of eminent domain as to characterize the whole taking as one without authority. In *Shizas* v. *City of Detroit* (1952), 333 Mich. 44 [52 N.W.2d 589], the Supreme Court of Michigan held invalid a statute authorizing the taking of private lands for automobile parking facilities which allowed not to exceed 25 per cent of the floor area of the structures to be built thereon to be leased for other commercial activities. ■ While it might be argued in the present case that the percentage area to be used for other commercial activity is small enough to be merely an incident to the parking activity and not in itself enough to invalidate the whole plan, nevertheless it aids in characterizing the whole operation as a private one for private gain. (See also *Public Parking Authority* v. *Board of Property Assessment*, 377 Pa. 274 [105 A.2d 165].)

The city argues at length that it will retain control of rates to be charged the motoring public through its police power. ■ If it be assumed that the city would have the power thus to fix the rates and otherwise prescribe regulations for parking (see *Serve Yourself Gas etc. Assn.* v. *Brock*, 39 Cal.2d 813 [249 P.2d 545]), it is the rule that the police power cannot be used as a means of regulating the activities of particular individuals and exclude from such regulations others of the general class of which the individual is a member. (U.S. Const., 14th Amend., § 1.)

■ The argument is made that parking at any reasonable rate is serving a public need in metropolitan San Francisco. If "public use" is to be given such a broad meaning, it would appear that all off-street parking facilities in San Francisco, regardless of ownership and primary purpose of operation, would be serving a public use. ■ The Constitution does not contemplate that the exercise of the power of eminent domain shall secure to private activities the means to carry on a private business whose primary objective and purpose is private gain and not public need. ■ The parking facility contemplated in the present case appears to be narrowed to such an enterprise.

It is concluded that the city may not proceed as it is proposing in the present case to acquire possession of the land

under its constitutional power of eminent domain as implemented to that end by general law.

The validity of other steps taken or anticipated by the city has been questioned. As the city's plan has failed in its initial step we do not deem it necessary to consider or discuss the propriety of subsequent action if contemplated.

The alternative writ is discharged, and the application for the peremptory writ is denied.

Gibson, C. J., Edmonds, J., Carter, J., Traynor, J., Schauer, J., and Spence, J., concurred.