[No. B074678. Second Dist., Div. Three. June 12, 1995.]

SHELL CALIFORNIA PIPELINE COMPANY, Plaintiff and Respondent,
v.
CITY OF COMPTON, Defendant and Appellant.

**COUNSEL**

Legrand H. Clegg II, City Attorney, and Wilmot A. Odom, Chief Deputy City Attorney, for Defendant and Appellant.

Sullivan, Workman & Dee, Roger M. Sullivan, Henry K. Workman and Joseph S. Dzida for Plaintiff and Respondent.

## OPINION

KLEIN, P. J.—Defendant and appellant City of Compton (the City) appeals the judgment entered following court trial granting plaintiff and respondent Shell California Pipeline Company (SCPC) concurrent, nonexclusive, subsurface pipeline easements for two oil product pipelines that run under the City's streets.

Because SCPC is a public utility entitled to condemn the instant easements and the evidence adduced at trial supports the trial court's finding of public interest and necessity for the easements, the judgment is affirmed.

### FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Historical information.*

Shell Oil Corporation (Shell) operated two oil product pipelines from its Dominguez Refinery in Carson to its bulk storage and distribution plant in South Central Los Angeles pursuant to franchise agreements with the City. Two and five-tenths miles of one pipeline and three and four-tenths miles of the other run beneath the City's streets. The franchise agreements expired on November 13, 1990, and in October 1991, respectively. When negotiations to renew the agreements failed, Shell transferred title to the pipelines to its subsidiary, SCPC, a public utility, in October 1990.

### 2. *Eminent domain proceedings in the trial court.*

On November 9, 1990, SCPC filed a complaint against the City seeking to acquire by eminent domain "concurrent, nonexclusive, subsurface pipeline easements . . . ."

Both sides waived jury trial and stipulated SCPC was a public utility.

Jerry Tintle, senior land agent of Shell Pipeline Corporation and vice-president of SCPC, testified the two pipelines together transported approximately twenty thousand barrels of petroleum products, primarily automobile gasoline, on a daily basis. The Shell distribution center in South Central Los Angeles, which serves the Los Angeles market, holds approximately a one-day supply of oil products. If the pipelines could not be operated, Shell would be forced to deliver the gasoline in tanker trucks after the supply on hand at the distribution center had been depleted. Tintle estimated 93 to 100 tanker trucks would be required to deliver the amount of petroleum products currently being transported in the pipelines. This number of trucks, in

Tintle's opinion, would increase traffic congestion and have an adverse impact on air quality.

Tintle also opined public necessity required SCPC to have easements in the pipelines because of the need for "an uninterrupted, secure pipeline system to transport the size volumes of product in the L.A. basin and to continue to serve the public [as Shell] has done in the last forty years."

In Tintle's opinion, the two-and-a-half-foot-wide nonexclusive easements being sought was the least intrusive interest in property which would secure the continued operation and maintenance of the pipelines.

Tintle further testified SCPC would have to obtain a permit from the City whenever it sought to repair or excavate the pipelines just as it had in the past.

Regarding the negotiations which had preceded the institution of this litigation, Shell had offered to renew the franchise agreements for 10 years at the rate normally paid for 10-inch pipelines and had offered to pay that amount, approximately $200,000, upon execution of the new agreements. Although the City tentatively agreed to accept that amount, it insisted on a "favored nations" clause. Under that clause, Shell would have been obligated to pay the City a rate equal to the highest rate it paid any other municipality.

The trial exhibits indicate SCPC applied for tariff rate approval for use of the pipelines as a public utility in October 1990. Its application states SCPC "holds itself out to the public to provide the services contained in [the tariff]." The California Public Utilities Commission (CPUC) approved the tariff and Shell immediately commenced operation of the pipelines as a public utility.

The parties stipulated the fair market value of the easements in issue was $105,000.

3. *The trial court's ruling.*

The trial court awarded SCPC concurrent, nonexclusive subsurface pipeline easements for the pipelines in issue for $105,000. The trial court found SCPC enjoyed the right of condemnation as a public utility and that the pipelines had been dedicated to public use based on the amount of oil transported which otherwise would have to be carried by tank trucks, thereby adding to traffic congestion and air pollution. Further, the trial court found the public interest adequately was protected by the CPUC which set the tariff

for use of the pipelines. The trial court concluded the "project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury in that it will continue to be utilized as it has been over the years."

The trial court noted the City had failed to show the granting of the easement in any way interfered with the operation of the City or its streets or any problem connected with the maintenance of the pipelines "vis-à-vis the operations of the [C]ity."

The trial court further indicated it understood the City would prefer to continue the franchise arrangement under which it would realize greater income. However, no legal impediment prevented SCPC from taking the instant easements by condemnation. Finally, with respect to the equities of the situation, the trial court found SCPC had negotiated in good faith with the City. "The evidence is that [SCPC] offered more to the [C]ity in its negotiations than legal requirements would have necessitated to continue the franchise arrangement, including making a payment on the basis that the pipeline was larger than it actually is, . . . ."

The City moved for a new trial and for judgment notwithstanding the verdict. Both motions were denied.

## CONTENTIONS

The City contends the California franchise statutes preclude SCPC, a private public utility, from taking, by eminent domain, an easement for a subsurface pipeline and that SCPC failed to establish public interest and necessity for the easements.

## DISCUSSION

1. *SCPC properly may seek to condemn the instant easements.*

At trial, the parties stipulated SCPC is a public utility pipeline corporation. As such, it has the power of eminent domain. (Pub. Util. Code, § 615.)[1]

---

[1]Public Utilities Code, section 615 provides: "A pipeline corporation may condemn any property necessary for the construction and maintenance of its pipeline."

All subsequent statutory references are to the Public Utilities Code, unless otherwise specified.

The power of eminent domain may be exercised with respect to public property if the proposed use does not interfere with existing or anticipated public use. (Code Civ. Proc., § 1240.510.)[2]

 Notwithstanding the foregoing, the City contends the Broughton Act (§ 6001 et seq.), which applies to franchises in general, and the Franchise Act of 1937 (§ 6201 et seq.), which applies specifically to pipelines (collectively, the franchise laws), are the only means by which a right to use the public streets may be acquired.

Consistent with this interpretation, the City points out the Broughton Act provides a franchise in the public streets may be acquired pursuant to the act "and not otherwise." (§ 6001.)[3] The Franchise Act of 1937 contains provisions which specifically address oil pipeline franchises, the application process and the fees which may be charged. These specific provisions, the City asserts, control over more general laws.

The City reads Code of Civil Procedure, section 1240.110, subdivision (a), in conjunction with section 6001 and concludes an entity with condemnation powers may acquire subsurface rights through condemnation unless the rights sought are in the public streets in which case the entity must proceed as provided in the franchise laws.[4]

We disagree with the City's interpretation. The franchise laws merely establish the manner in which an entity may obtain a franchise. They do not provide the only manner in which a right to use the public streets may be acquired. As noted in *Southern Pacific Pipe Lines, Inc.* v. *City of Long Beach* (1988) 204 Cal.App.3d 660, 666 [251 Cal.Rptr. 411], the franchise laws do not "confer on local governments the power to grant franchises. Rather, they each provide procedures to be followed when other laws empower these local governments to grant franchises."

---

[2]Code of Civil Procedure section 1240.510 provides, in part: "Any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire for that use property appropriated to public use if the proposed use will not unreasonably interfere with or impair the continuance of the public use as it then exists or may reasonably be expected to exist in the future."

[3]Section 6001 provides, is part: "Every franchise . . . shall be granted upon the conditions in this article provided, and not otherwise, except when such franchises are granted pursuant to" the Franchise Act of 1937.

[4]Code of Civil Procedure, section 1240.110, subdivision (a), provides: "Except to the extent limited by statute, any person authorized to acquire property for a particular use by eminent domain may exercise the power of eminent domain to acquire any interest in property necessary for that use including, but not limited to, . . . subsurface rights, . . ."

■ Thus, the franchise laws merely specify the terms and conditions upon which a franchise may be granted. These laws do not, however, preclude acquisition of an easement under the law of eminent domain.

The City next asserts the condemnation proceedings in this case cannot be harmonized with section 6231.5, subdivision (f), which requires a common carrier pipeline to establish to the satisfaction of the City, inter alia, that its property is dedicated to the service of the public.[5]

The City argues SCPC circumvented these requirements by condemning the instant easements.

However, as pointed out by SCPC, section 6231.5, subdivision (d), expressly acknowledges the availability of eminent domain proceedings to condemn the property of a municipality for a pipeline easement.

Had the Legislature intended to disallow such proceedings, it would have done so in 1989 when it enacted these provisions.

Section 6231.5, subdivision (d), provides in part: "Notwithstanding any other provision of law, until January 1, 1990, a municipality which is involved in eminent domain proceedings in which a court order for possession has been issued relating to an easement for a pipeline system transmitting oil or products thereof may adopt an ordinance setting its fee without following the provisions of this section."

We agree with SCPC's reading of these subdivisions and conclude the Legislature was aware of the right of a public utility pipeline system to condemn an easement for its pipeline system and chose not to end that practice.

---

[5]Section 6231.5, subdivision (f), provides: "Any nonpublic utility pipeline system transmitting oil or products thereof covered by subdivision (e) [which addresses the rate to be paid by franchisees transmitting oil products] on December 31, 1989, that converts to public utility status shall continue to pay the fee established pursuant to subdivision (e) for the remaining term of its franchise, . . . Upon expiration of its franchise, . . . a nonpublic utility pipeline system transmitting oil or products thereof that has converted or seeks to convert to public utility status shall establish to the satisfaction of the franchising authority all of the following: [¶] (1) Its property is dedicated to the service of the public. [¶] (2) Its rates for transportation are established pursuant to tariffs filed with the Public Utilities Commission. [¶] (3) Its accounts and records are established pursuant to rules and regulations adopted by the commission. [¶] (4) It has filed an appropriate annual report with the commission. [¶] (5) Its rates for transportation are just, reasonable, and nondiscriminatory, as evidenced either by an order of the commission approving those rates, or an application for approval of its rates that is pending with the commission."

### a. *Court involvement not fatal.*

The City's further argument SCPC avoidance of the franchise laws grants the courts power to control subsurface use of the public streets also is meritless.

Shell transferred ownership of its pipeline system to SCPC, a public utility, which is regulated by the CPUC. Shell surrendered the benefits associated with private control of its pipeline and subjected itself to regulation by the CPUC. With this burden comes the benefit of the right to condemn.

Although a pipeline operator/franchisee may apply to the courts to set aside a franchise fee proposed by a municipality which violates the Constitution or is abusive (see *Shell Oil Co.* v. *City of Santa Monica* (9th Cir. 1987) 830 F.2d 1052, it does not follow that this is the only role of a court in this area.

In fact, *Shell Oil Co.* v. *City of Santa Monica, supra,* 830 F.2d at page 1054, noted in footnote 1, "Shell does not claim that it is a common carrier or public utility that would be both subject to PUC regulation and vested with the power of eminent domain. [Citations.]"

### b. *Law in other jurisdictions not controlling.*

The City next contends it is well settled in other jurisdictions that the right to use the public street may only be acquired by franchise or grant from the municipality. (See e.g., *People* v. *State Tax Commission* (1928) 247 N.Y. 281, 285 [160 N.E. 371, 57 A.L.R. 374].)

Accepting this assertion as true, the foregoing discussion indicates the rule is contrary in California. The Legislature expressly granted public utility pipeline corporations the right of eminent domain. This right includes the ability, under certain circumstances, to condemn public property.

### c. *City's other contentions also without merit.*

Finally, the City contends the procedures required by the franchise laws ensure public participation through notice and opportunity to protest before the municipality's legislative body before the franchise is granted. (§§ 6232, 6233.) Further, the municipality's franchise decision is subject to the right of referendum by the people. (§ 6234.) This right is nullified by allowing SCPC to condemn an easement for its pipelines.

Similarly destroyed are the municipality's rights to require the franchisee to bear the cost of removal, relocation and repair and the municipality's right to impose terms and conditions it deems necessary to protect the public interest. The City asserts the participation of its administrative staff is necessary in light of the toxic nature of the products being carried under its streets. Without this oversight by the municipality, the courts will have to plan and supervise pipeline activities.

The City's assertions in this regard overlook the involvement of the CPUC in the regulation of SCPC's pipelines. (See § 701 et seq.)

In sum, we conclude nothing in the franchise laws or elsewhere precludes SCPC's condemnation of a nonexclusive subsurface easement in the public streets for its pipelines.

2. *Substantial evidence supports the trial court's finding of public interest and public necessity for the easements.*

The City contends Tintle's testimony did not establish that public interest and necessity required the condemnation of the easements. (Code Civ. Proc., § 1240.030, subd. (a).)[6, 7]

The City asserts the fact thousands of other motor vehicles traverse the public streets on a daily basis shows the public would not be affected adversely by inoperability of the pipelines. Additionally, other oil companies provide the same products. Thus, operation of the pipeline affects Shell's profits more than the public's need for gasoline.

However, " '[p]ublic interest and necessity' include all aspects of the public good including but not limited to social, economic, environmental, and esthetic considerations." (Legis. committee com., 19 West's Ann Code Civ. Proc. (1982 ed.) § 1240.030, p. 490.)

Public use and necessity are to be construed liberally in favor of the condemnor. (*City of Hawthorne* v. *Peebles* (1959) 166 Cal.App.2d 758, 761 [333 P.2d 442].)

---

[6] Code of Civil Procedure section 1240.030, provides: "The power of eminent domain may be exercised to acquire property for a proposed project only if all of the following are established: [¶] (a) The public interest and necessity require the project. [¶] (b) The project is planned or located in the manner that will be most compatible with the greatest public good and the least private injury. [¶] (c) The property sought to be acquired is necessary for the project."

[7] SCPC concedes it is not entitled to the presumption the project is required by public interest and necessity found in Code of Civil Procedure section 1245.235, subdivision (a), because it is not a public entity.

Here, Tintle's testimony established that acquisition of the pipeline easement would allow Shell to provide lower priced gasoline to the public and to transport oil products by subsurface pipeline rather than tanker trucks. Both of these considerations support the trial court's finding the easements were required by public interest and necessity.

The City asserts the power of condemnation may be exercised only to take property for a public use and SCPC failed to establish the public benefit is the primary and substantial object of the taking rather than merely incidental to the private benefit. The only evidence on this issue at trial was the fact the pipeline had been used once by another oil company on September 23, 1992. The City claims this is insufficient to transform Shell's private use of the pipeline into a public use.

The City's argument misreads the law. At issue "is not the number or type of customers, but whether the utility has dedicated its property to public use. Here [SCPC] has so dedicated its property and has submitted to the jurisdiction of the CPUC. That is all that is required to become a public utility." (*Unocal California Pipeline Co.* v. *Conway* (1994) 23 Cal.App.4th 331, 335 [28 Cal.Rptr.2d 429].)

Further, Code of Civil Procedure, section 1240.010 states, in part, "Where the Legislature provides by statute that a use, purpose, object, or function is one for which the power of eminent domain may be exercised, such action is deemed to be a declaration by the Legislature that such use, purpose, object, or function is a public use." Because the Legislature has granted pipeline corporations the right of eminent domain (§ 615), the Legislature has declared pipeline use a public use.

Moreover, the case cited by the City, *City & County of San Francisco* v. *Ross* (1955) 44 Cal.2d 52, 59 [279 P.2d 529], is distinguishable because it involved property which would have been operated by a private person without regulation as a public utility. Here, SCPC is regulated.

Regarding proper location of the easements, the history of continuous use of the pipelines in their present location indicates public necessity for continuation of the existing use. (*Kachadoorian* v. *Calwa County Water Dist.* (1979) 96 Cal.App.3d 741, 749 [158 Cal.Rptr. 223].) As SCPC notes, the City has not suggested an alternate location.

The City relies on *City of Los Angeles* v. *Keck* (1971) 14 Cal.App.3d 920 [92 Cal.Rptr. 599], for the proposition legal necessity is lacking where there is no conflict between use of the property by the condemnor and the owner.

However, in that case the utility already had an easement which it attempted to convert into a fee simple interest. *City of Los Angeles* v. *Keck, supra,* 14 Cal.App.3d at page 928, ruled the easement adequately permitted any future anticipated use and thus the fee estate was not necessary. Here, SCPC seeks only an easement in the property. Without it SCPC has no right to operate its pipeline under the City's streets.

The City cites *City of Carlsbad* v. *Wight* (1963) 221 Cal.App.2d 756 [34 Cal.Rptr. 820], for the proposition necessity is lacking where property is taken solely for convenience and economy. In that case, the trial court denied condemnation based on substantial expert testimony which supported the conclusion necessity was lacking. The trial court's ruling on this point is an issue of fact. On appeal, this finding will be upheld if supported by substantial evidence. (*Id.,* at p. 762.)

Here, the trial court found in favor of SCPC. Tintle's testimony and the presumption arising from the continuous previous usage of the pipeline adequately support the trial court's ruling.

## CONCLUSION

The trial court properly granted SCPC nonexclusive subsurface easements for the pipelines. Substantial evidence supported the trial court's finding of public interest and necessity.

## DISPOSITION

The judgment is affirmed. Each party to bear respective costs on appeal.

Croskey, J., and Kitching, J., concurred.