**FLORIDA POWER & LIGHT COMPANY, Petitioner,**

v.

**FEDERAL ENERGY REGULATORY COMMISSION, Respondent,**

**Utilities Commission, City of New Symrna Beach, Florida, et al., Intervenors.**

No. 95–1283.

United States Court of Appeals, District of Columbia Circuit.

Argued April 22, 1996.

Decided July 19, 1996.

Steven J. Ross, Washington, DC, argued the cause, for petitioner, with whom Randolph L. Elliott and Jacob A. Bouknight, Jr. were on the briefs.

Katherine Waldbauer, Attorney, Federal Energy Regulatory Commission, Washington, DC, argued the cause for respondent, with whom Jerome M. Feit, Solicitor, and Joseph S. Davies, Deputy Solicitor, were on the brief.

David E. Pomper, Washington, DC, argued the cause for intervenors, with whom Robert A. Jablon and Harvey L. Reiter were on the brief. Alan J. Roth entered an appearance.

Before: EDWARDS, Chief Judge, WALD and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

Petitioner Florida Power & Light Company ("FP&L") seeks review of orders of the Federal Energy Regulatory Commission ("FERC") rejecting FP&L's filing of unexecuted back up transmission agreements with Fort Pierce and Vero Beach, Florida. FP&L sought through these agreements to charge the two cities for back up transmission service it claimed that it was providing the cities by default because of the physical properties of the interconnections among FP&L and the two cities. Because we conclude that FERC's orders are not supported by substantial evidence with regard to the Commission's interpretation of a reserve power sharing agreement among certain Florida utilities, we grant the petition for review and remand the case to FERC.

## I. Factual Background

The cities of Vero Beach and Fort Pierce, Florida, are served respectively by the Vero Beach Utilities Commission ("Vero Beach") and the Fort Pierce Utilities Authority ("Fort Pierce") (collectively "the Cities"). For thirty-six years, the Cities have been directly interconnected to each other through a single 138–kilovolt ("kV") tie line which they own and operate pursuant to an interconnection agreement between them. This interconnection agreement allows marginal power demand to be supplied by the cheapest source, regardless of which city is that source. This system is known as "economic dispatch" or "economy energy" transfer. Both cities are also independently connected to FP&L by 138 kV lines and are thereby indirectly connected to one another through the FP&L grid. This arrangement means that, should the Cities' tie line unexpectedly go out of service for any reason, under the laws of physics any power being delivered over the tie line automatically and instantaneously would be rerouted over the FP&L transmission system to the receiving city.

In 1993, in an unrelated proceeding, FERC approved a "transmission backup" tariff arrangement between FP&L and the Utilities Commission of New Smyrna Beach, Florida ("New Smyrna"). *Florida Power & Light Co.*, 62 FERC ¶ 61,251, *reh'g denied,*

65 FERC ¶ 61,411 (1993) ("the New Smyrna Orders"). New Smyrna, which purchased power over a single line from Florida Power Corporation ("FPC"), lacked sufficient capacity to meet its power demand on its own. FP&L convinced FERC that, if the single line connecting New Smyrna and FPC were to go down, the FPC power would automatically be rerouted over FP&L lines. *Id.* at 62,692–93. FERC accordingly approved a tariff for "transmission backup" service which required New Smyrna to compensate FP&L for maintaining the reserve capacity to service New Smyrna.

Following the New Smyrna Orders, FP&L began negotiating with the Cities to determine whether FP&L should require a back up transmission charge there as well. Then, in August 1994, while these negotiations continued, the tie line between the Cities was knocked out of service by lightning, causing its first outage in thirty-six years. For two weeks, the Cities continued their economic dispatch arrangement, but they transmitted the energy over the FP&L lines. They had no agreement with FP&L permitting such transmission, and they did not notify FP&L that they were conducting the transmission. After two weeks, the Cities stopped their economic dispatch arrangement when they realized that they had no permission to transfer power back and forth via the FP&L lines. The outage of the tie line continued for another five months, but the Cities did not conduct economic dispatch during that period. Although the Cities have expressed a willingness to compensate FP&L for the two-week use of their lines, the parties had not reached agreement on this compensation as of the date of oral argument.

In November 1994, FP&L filed with FERC proposed "Reserve Transmission Service Agreements" between FP&L and both of the Cities. FP&L stated that, during an outage on the tie line between the cities, electricity would automatically flow to FP&L's lines, and that FP&L was therefore required to maintain sufficient transmission capacity at all times to transmit this power. The proposed agreements, if approved by FERC, would have established a tariff under which, according to the Cities, they would pay FP&L about $225,000 a year to compensate FP&L for providing standby transmission service to the Cities. The Cities intervened, arguing that FP&L did not need to provide any reserve capacity because the Cities would simply discontinue their joint dispatching operation should the tie line go out again. They further argued that each city had sufficient generation capacity to meet its own needs during any outage of the tie line and that they could bring this capacity on line within thirty minutes of any tie line outage. Finally, they claimed that "they were already entitled to use FP&L's system for transmission for a period of 30 minutes while they adjusted for the loss of the tie line without compensation." Respondent's Brief at 7. They argued that usage of another power company's transmission facilities in such a situation is considered "inadvertent" under the guidelines of the Florida Coordinating Group ("FCG"), of which both the Cities and FP&L are members.

FERC, accepting the Cities' arguments, summarily rejected FP&L's filing. *Florida Power & Light Co.,* 70 FERC ¶ 61,007 (1995). The Commission concluded that the Cities (1) have sufficient resources to meet their own loads and therefore (2) will never use the back up service FP&L claims to provide for more than 30 minutes—"the grace period prescribed ... for generation outages." *Id.* at 61,017. FERC also noted that the August 1994 outage was "the single forced outage [of the Cities' tie line] that has occurred during the last 36 years" and that it was unlikely to recur. *Id.* In May 1995, FERC denied FP&L's request for rehearing. *Florida Power & Light Co.,* 71 FERC ¶ 61,125 (1995). Among other things, FERC noted that this case stands "in sharp contrast" to the case involving New Smyrna. *Id.* at 61,403 n. 1. In the New Smyrna case, FERC had concluded that FP&L really was providing back up service to New Smyrna for which it deserved payment. FP&L petitions for review of the two FP&L orders rejecting the tariff request. The Cities intervene on behalf of FERC.

## II. Analysis

Petitioner's case turns on the applicability of the so-called "thirty-minute grace period"

in this situation. If the grace period applies, then it is possible that the city taking economy energy at the time of a break in the tie line would have time to replace that energy with energy of its own generation. On the other hand, if it does not apply, then the instantaneous "jump" of the economy energy onto FP&L's line at the time of a break in the tie line would be problematic because it would occur without FP&L's permission.

In its first order, FERC described the thirty-minute period as "the grace period prescribed by the North American Electric Reliability Council [ ("NERC") ] for *generation* outages." *Florida Power & Light Co.,* 70 FERC ¶ 61,007, at 61,017 (emphasis added). After FP&L noted in its request for rehearing that a break in the Cities' tie line is *not* a generation outage, but a transmission outage, FERC stated in its second order that "[t]he thirty-minute 'grace period' we were referring to in the original order is the 30–minute period within which a Florida Coordination Group (FCG) control area must restore operating reserve margins after a contingency has occurred." *Florida Power & Light Co.,* 71 FERC ¶ 61,125, at 61,403.

FERC's reference to "the thirty-minute 'grace period' " evokes an FCG agreement created to comply with NERC guidelines, under which a utility such as either of the Cities must have enough generation and transmission capacity to meet its demand without jeopardizing the reliability of other utilities interconnected with it. That means that it must have on line additional generation equal to its largest unit, so that if that unit failed, the reserve generation capacity would be available almost immediately. Utilities who are members of the FCG have set up a power-sharing arrangement so that each member need not separately maintain sufficient on-line capacity to comply with this requirement. Under the FCG power sharing arrangement, each member utility maintains some excess generation capacity on line. When one member unexpectedly loses capacity due to a "disturbance," it makes up for it by using reserve energy from other members. It then has thirty minutes to either start up its own replacement generation capacity or purchase energy on the market.

FCG members have also agreed that using reserve capacity in this manner is an "inadvertent" use for which no transmission charge may be levied.

It is undisputed that all the utilities involved in these proceedings are FCG members. Nevertheless, FP&L argues that the instant case is not an appropriate factual situation for reliance on the FCG thirty-minute grace period. When the Cities' tie line goes out, neither city has lost its individual generating capacity. Therefore, the FCG arrangement gives it no right to the FCG reserve capacity energy. FERC and the Cities point to the FCG Florida Specific Procedure for Operating Reserves (Oct. 1994), which provides that "[o]perating reserves shall be made available for up to 30 minutes following a disturbance." They argue that a tie-line outage would qualify as a "disturbance." Unfortunately, that document does not define "disturbance." FERC and the Cities contend that FCG's Planning Criteria (Oct. 1989), which classifies both "Loss of generation" and "Loss of transmission" as "Possible but improbable disturbances," supports their interpretation. They argue that a break in the tie line is a "Loss of transmission," which in turn qualifies as a "disturbance." FP&L responds by noting that "the planning criteria do not define the availability of operating reserves. The mere use of the word 'disturbance' in both guidelines does not make the definitions interchangeable." Petitioner's Reply Brief at 10. The Cities also point to a publication entitled Florida's Electric Utilities: A Reference Guide (1994), which contains a definition of "Spinning Reserve" discussing the availability of reserve power in cases of "emergencies causing the loss of a generation unit *or transmission line failure.*" *Id.* at 190 (emphasis added). FP&L responds that this definition is not properly before the court because it is not in the record. In any case, FP&L argues that even if a loss of transmission qualifies as a disturbance for reserve power access purposes, this does not mean that a loss of transmission *in an economy energy transfer situation* necessarily qualifies. The distinction between a utility's internal transmission loss and a break in an economy energy transfer line such as that

linking the Cities is relevant. FP&L plausibly argues that reserve capacity is available when loss of transmission capacity makes a utility unable to transmit its own power to its own customers, but not when a transmission difficulty only impedes its ability to import economy energy from another utility.

Fortunately, our task today is not to interpret the FCG guidelines or to decide how they apply to the facts of this case. That is FERC's job. We merely face the job of determining whether FERC has supported its decision with substantial evidence. *See* 16 U.S.C. § 825*l* (b) (1994). We conclude that it has not. We cannot readily discern the exact meaning of the FCG guidelines in this context and FERC's orders provide no interpretive guidance. The first order does not even refer to FCG, its thirty-minute grace period, or its guidelines. It simply refers to the thirty-minute "grace period prescribed by [NERC] for generation outages." *Florida Power & Light Co.,* 70 FERC ¶ 61,007, at 61,017. The second order discusses the FCG thirty-minute grace period, but simply assumes that it applies to this factual situation without explaining why. *Florida Power & Light Co.,* 71 FERC ¶ 61,125, at 61,403. We are unable to glean from these orders the basis of FERC's decision.

The problems with FERC's orders do not end there. Even if we were to assume that the FCG reserves are available to the Cities if the tie line breaks down, both FERC and the Cities have failed to show from the record that the Cities would actually access the FCG reserve power in such a scenario. As a matter of physics, the economy energy would continue to flow between the Cities in the event of a tie line breakdown because it would flow across FP&L's lines. That economy energy is *not* FCG reserve power, and we can only assume that it would take some amount of time for the city that was receiving economy energy at the time of the breakdown to switch to FCG reserve power. The economy energy would therefore flow over FP&L's line without permission or compensation for whatever time it would take the city to switch. FERC's orders do not account for these facts.

We do not decide today whether the Cities must compensate FP&L for back up service and, if so, at what rate. We merely remand the case to FERC for further explanation or reconsideration of its decision. The petitioner also requests that we order FERC to conduct an evidentiary hearing on remand rather than disposing of the case through summary procedures as it did originally. We decline to grant that request. Whether or not, in light of our disposition today, the facts are sufficiently established so as to permit resolution of this case through FERC's summary procedures, *see* Summary Disposition, 18 C.F.R. § 385.217 (1995), is a matter for the Commission to consider on remand.

### III. Conclusion

Because we cannot determine the basis of FERC's reliance on the FCG thirty-minute grace period in forming its conclusion that the Cities would have access to FCG reserve power in the event of a breakdown in the tie line, we grant the petition for review and remand the case to FERC for further explanation or reconsideration of its decision in light of this opinion.