Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued May 9, 2003                    Decided June 13, 2003

No. 02-1087

EAST TEXAS ELECTRIC COOPERATIVE, INC. ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

SOUTHWEST POWER POOL, INC., ET AL.,
INTERVENORS

———

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

———

*John H. Conway* argued the cause for petitioner. With him on the briefs were *Christine C. Ryan*, A. Hewitt Rose, III and *Brian C. Drumm*.

———

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Dennis Lane*, Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was *Cynthia A. Marlette*, General Counsel.

*Wallace F. Tillman* was on the brief for *amicus curiae* National Rural Electric Cooperative Association in support of petitioners.

Before: GINSBURG, *Chief Judge*, and ROGERS and TATEL, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: This case involves a recurring issue under the open access policies of Order No. 888 of the Federal Energy Regulatory Commission ("FERC") regarding the extent to which utilities should receive compensation for the use of their transmission facilities for services provided in concert with other transmission providers. *See Transmission Access Policy Study Group v. FERC* ("TAPS"), 235 F.3d 667, 725–26 (D.C. Cir. 2000), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). East Texas Electric Cooperative, Inc. and two of its member utilities (together, "East Texas") petition for review of orders accepting Southwest Power Pool's ("SPP") procedure for allocating network transmission revenue among its member utilities. *Southwest Power Pool, Inc.*, 89 F.E.R.C. ¶ 61,284 (1999) ("*Initial Order*"); Order on Rehearing, *Southwest Power Pool, Inc.*, 98 F.E.R.C. ¶ 61,038 (2002) ("*Rehearing Order*"). East Texas challenges FERC's conclusion that the allocation procedure is fair and just, claiming that it is unduly discriminatory to require a showing of integration only by small transmission owners such as East Texas in order to receive revenue allocations for the use of its facilities by SPP. East Texas also contends that FERC's finding that East Texas is a customer, and thus not integrated with SPP's transmission system, is unsupported by substantial evidence in the record. We deny the petition with regard to the integration standard but grant the petition because of a lack of any valid finding that East Texas's facilities are not integrated with SPP's transmission system.

**I.**

East Texas is a non-profit generation and transmission electric cooperative located in Texas with three members, two of which, Northeast Texas Electric Cooperative and Tex–La Electric Cooperative of Texas, are also petitioners. SPP is a power pool that provides electric transmission services on behalf of its transmission-owner members pursuant to its Regional Tariff. The SPP came into existence as a regional reliability council. *SPP, Inc*., 82 F.E.R.C. ¶ 61,267 at 62,049 (1998). According to FERC, East Texas was a participant in SPP prior to SPP's proposed amendments to the Regional Tariff. East Texas seeks to recover the costs of its transmission facilities from SPP's network customers should it participate in SPP's Regional Tariff.

In Order No. 888, FERC required all jurisdictional utilities to offer network services to any customers which agreed to pay set tariffs under its open access tariff policy. *Promoting Wholesale Competition Through Open Access Nondiscriminatory Transmission Servs. by Pub. Utils.*, Order No. 888, FERC Stats. & Regs. ¶ 31,036, at 31,636, 61 Fed. Reg. 21,540 (1996) ("Order No. 888"), *on reh'g*, Order No. 888–A, FERC Stats. & Regs. ¶ 31,048 at 30,530 (1997) ("Order No. 888–A"), *clarified*, 79 F.E.R.C. ¶ 61,182 (1997), *on reh'g*, Order 888–B, 81 F.E.R.C. ¶ 61,248, 62 Fed. Reg. 64,688 (1997), *on reh'g*, Order 888–C, 82 F.E.R.C. ¶ 61,046 (1998), *aff'd sub nom. TAPS*, 235 F.3d 667. In doing so, FERC addressed whether those customers would be entitled to credits from the transmission-providing utility based on any transmission-related benefits that the utility might receive from the customer's transmission facilities. Order No. 888, ¶ 31,036 at 31,741–43. While FERC committed itself to a case-by-case determination, it warned that "mere interconnection between a customer's facilities and the transmission provider's facilities will not be sufficient to warrant a cost credit." *TAPS*, 235 F.3d at 725. FERC thus "required the customer to demonstrate that its 'transmission facilities are integrated with the transmission system of the transmission provider' and 'provide additional benefits to the transmission grid in terms of capability

and reliability, and [are] relied upon for coordinated operation of the grid.' " *Id.* at 726 (quoting Order No. 888, ¶ 31,036, at 31,742) (alteration in original).

It was in this context that SPP took a further step toward compliance with Order No. 888 (and its progeny) when, on September 7, 1999, it filed an amendment to its open access transmission tariff (i.e., its "Regional Tariff") to add network integration service. Previously, SPP offered only "point-to-point" transmission service, i.e., service that extends between specified points of receipt of electricity onto the transmission grid and specified points of delivery of the electricity from the grid. *See TAPS*, 225 F.3d at 725 n.12; *SPP, Inc.*, 82 F.E.R.C. at 62,049. Under that service, thirteen transmission-owner SPP members had agreed to participate in the Regional Tariff and, thus, to pool their resources, average their costs, and share revenues with members participating in the particular transaction. 82 F.E.R.C. at 62,049–50 & n.2. By contrast, under network service all of the electricity demand or "load" needed by a particular customer will be met by the transmission provider from available generators or other power sources on the grid as needed. *TAPS*, 225 F.3d at 724–25. As part of the 1999 amendment to its Regional Tariff, SPP included a new membership agreement to administer network transmission service and to act as an agent for the participating transmission owners. *Initial Order*, 89 F.E.R.C. at 61,887. SPP proposed "to use each member utility's annual transmission revenue requirement as the basis for zonal network rates," *id.* at 61,889, and that revenues for "all network service would generally be allocated to the host zone where the load is located." *Id.* at 61,890. Under SPP's proposal, all network revenues would therefore be allocated among transmission owners designated in certain schedules of the Regional Tariff as the "hosts" of pricing zones. Payments by a customer would be transferred to the utility or utilities whose "host zone" contains the location where the "load is allocated," i.e., the location where the customer receives the electricity.

East Texas filed a protest that included a challenge to SPP's procedure for allocating network revenues from cus-

tomers who took network service from SPP. It argued that SPP's procedure was unfair because transmission facilities that East Texas owned that were located in SPP's service area could not receive any revenues for network services provided by SPP; even if East Texas signed the membership agreement and allowed SPP to use its facilities, it would not necessarily be listed as a pricing "host zone." According to East Texas, this unfairly discriminated against it, and undermined the incentive for small transmission owners to join regional transmission groups such as SPP, contrary to FERC's policy of encouraging the creation of regional groups that contain all transmission systems within a geographic area. *See Reg'l Transmission Orgs.*, Order No. 2000, FERC Stats. & Regs. ¶ 31,089 at 31,200 (1999), 65 Fed. Reg. 810 (2000), *on reh'g*, Order No. 2000–A, FERC Stats. & Regs. ¶ 31,092, 65 Fed. Reg. 12,088 (2000) (codified at 18 C.F.R. § 35.34) ("Order No. 2000"). SPP and two transmission-owners of SPP responded that East Texas's facilities are not integrated into the SPP system and do not provide any benefit to the SPP system by increasing the reliability or effectiveness of the system. Further, they maintained, East Texas could obtain compensation for any use of its transmission systems by filing for customer credits pursuant to Section 30.9 of the Regional Tariff. Section 30.9 provides that network customers owning facilities that are "integrated" with SPP's system "may be eligible to receive consideration either through a billing credit or some other mechanism." Under Section 30.9 "integrated" means "integrated into the plans or operations" of a transmission owner to serve the owner's customers.

In the *Initial Order*, FERC stated that:

> East Texas Cooperatives' opposition is limited to the fact that as owners of transmission facilities, they should be treated comparably to other transmission owners that make up the pricing zones. Their argument that it is discriminatory to only require small transmission owners to make a showing under Section 30.9 of the tariff ignores that fact that the large transmission owners currently provide grid transmission service. The issue of

> whether and to what extent East Texas Cooperatives' transmission facilities are integrated with CSW [a SPP member] is currently being litigated [in Docket EL98–66–000]. Consequently, acceptance here of the East Texas Cooperatives' position would prejudice the outcome of that hearing. Therefore, we will accept for filing SPP's treatment of revenues, subject to the outcome of the ongoing litigation.

*Id.* at 61,890–91. In seeking rehearing, East Texas argued that Section 30.9 was inapplicable and Docket EL98–68–000, in which the factual question of integration sufficient for a customer credit was being litigated, involved different parties and different issues.

In the *Rehearing Order* FERC reaffirmed its approval of SPP's revenue allocation procedure, but revised its reasoning. 98 F.E.R.C. at 61,108–10. FERC stated that in the *Initial Order* it had "generally agreed" with SPP and its responding members, again noting that East Texas's opposition was "limited to" wanting to be treated "the same as the large transmission owners that SPP has designated as pricing zones." *Id.* at 61,109. At this point, referring to its *Initial Order*, FERC stated that:

> East Texas Cooperatives' argument that it is unduly discriminatory or preferential to require them to rely on Section 30.9 for revenue allocation, while large transmission owners are designated as pricing zones, ignores the fact that the large transmission owners function in SPP as transmission *providers*, while the Cooperatives function in SPP as transmission *customers*.

*Id*. While agreeing with East Texas that Docket No. EL98–66–000 was "not sufficiently connected" to warrant conditioning acceptance of SPP's tariff amendment on the outcome of that litigation, and that Section 30.9 of the Regional Tariff on its face does not require transmission owners to demonstrate integration, FERC rejected East Texas's claim of undue discrimination. *Id*. at 61,109–10. FERC found that East Texas had not adequately refuted its "earlier findings" that

its facilities "are used solely to distribute power to their distribution members, do not provide any benefits to SPP in terms of additional capability or reliability, are not relied upon for coordinated operation of the SPP grid, and are not integrated with any SPP transmission provider." *Id.* at 61,110. FERC further found that East Texas "simply do[es] not meet SPP's criteria for inclusion of the transmission facilities under the SPP tariff." *Id.*

## II.

In contending that FERC was arbitrary and capricious in concluding that SPP's revenue allocation procedure was fair and just, East Texas maintains that the integration standard FERC applied is only appropriate for customers under Section 30.9 of the Regional Tariff, that East Texas is not a customer of SPP, that FERC never found that it was, and that there is not substantial evidence in the record to support such a finding. Further, East Texas contends, no other provision of the Regional Tariff authorizes such a test, the standard is contrary to FERC policy, and FERC has failed to provide an adequate explanation of why the standard should apply.

FERC responds that in the *Initial Order* it found that East Texas functions in SPP as a transmission customer, and, in any event, East Texas's position violates "both the governing general ratemaking principle and the specific application of § 30.9." Respondent's Br. at 15. As FERC explains, underlying Section 30.9 is the principle "that those who benefit from facilities should pay their costs," and that ratemaking principle "must be applied to prevent a mismatch between benefits and costs: 'The question [of credits] can only be determined on a case-by-case basis because it depends on whether the customer's facilities are truly integrated with the transmission system, rather than merely interconnected.'" *Id.* (quoting *TAPS*, 225 F.3d at 726) (alteration in original). FERC recalls, *id.* at 16, that in Order No. 888, it stated that "the principles of comparability compel us to apply the same

standard to the transmission provider's facilities for rate determination purposes" as are applied to the customer's facilities. Order No. 888 at 31,743 n.452; *see Fla. Mun. Power Agency v. Fla. Power & Light Co.*, 74 FERC ¶ 61,006 at 61,010 & n.48 (1996) (cited in Order No. 888, ¶ 31,036 at 31,742–43 & n.451). Consequently, FERC maintains, its policy in Order No. 2000 encouraging public power and cooperatives to participate in regional transmission organizations "must be tempered with the fundamental rate principle underlying § 30.9." Respondent's Br. at 17 n.6. Likewise, referencing the *Rehearing Order*, 98 F.E.R.C. at 61,110, FERC rejects East Texas's reliance on the "seven factors test" for distinguishing distribution from transmission as not relevant to the important point, namely that East Texas's facilities benefit only it and its members, not SPP. Respondent's Br. at 15, 17. In sum, from FERC's vantage point, "[t]his case involves application of a fundamental ratemaking principle: that cost responsibility should match cost benefit," and "parties should not be required to pay the costs of facilities or services unless they actually receive some benefit from them." *Id.* at 2. Thus, "whether the costs of [East Texas's] transmission facilities can be recovered from SPP's network customers turns on whether those facilities are integrated in SPP's network planning and operation, and thus benefit SPP's customers." *Id.*

Our review is confined to a determination of whether FERC's orders are arbitrary and capricious, an abuse of discretion, or contrary to law under the Administrative Procedure Act. *Mo. Pub. Serv. Comm'n v. FERC*, 215 F.3d 1, 3 (D.C. Cir. 2000); 5 U.S.C. § 706(2)(A). While the court's review of ratemaking decisions is highly deferential, *Pac. Gas & Elec. Co v. FERC*, 306 F.3d 1112, 1116 (D.C. Cir. 2002); *Mo. Pub. Serv. Comm'n*, 215 F.3d at 3, FERC still must provide a coherent and adequate explanation of its decisions. *See Fla. Power & Light Co. v. FERC*, 88 F.3d 1239, 1243 (D.C. Cir. 1996); *City of Vernon v. FERC*, 845 F.2d 1042, 1046 (D.C. Cir. 1988).

**A.**

In the *Initial Order*, FERC appears to require that East Texas make a showing of integration pursuant to Section 30.9 of the Regional Tariff in order to receive revenue allocations. 89 F.E.R.C. at 61,890–91. In the *Rehearing Order*, FERC retreated from the position that Section 30.9 is itself relevant, 98 F.E.R.C. at 61,109–10, but continued to press the point that East Texas must show that it is integrated with SPP's system to receive revenue under the Regional Tariff. *Id.* at 61,110. Essentially, then, FERC interpreted the Regional Tariff to include, similar to the principles it laid out in Order No. 888 for customer credits, a standard of integration that transmission owners must meet to qualify as pricing "host zones" to receive revenue allocations, and concluded that East Texas failed to meet this requirement. FERC stated that it was denying rehearing because East Texas "simply do[es] not meet SPP's criteria for inclusion of the transmission facilities under the [Regional] Tariff," criteria that require a showing that East Texas's transmission facilities benefit SPP's transmission system as a whole. *Id.*

The parties do not point to language in the Regional Tariff (or SPP's membership agreement) that indicates how an entity, upon joining SPP as a transmission-owner member, becomes a pricing "host zone" eligible to receive network revenue. However, the purpose of identifying "host zones" is to allow compensation of utilities for transmission service provided to the SPP system so that SPP, in turn, can provide network and point-to-point services. In other words, identification of a "host zone" can only follow from a determination that a utility is providing transmission service that benefits the SPP system as a whole. The Regional Tariff defines a "transmission owner" as a member "whose transmission facilities . . . make up the Transmission System," and "Transmission System" as the "facilities used by [SPP] to provide transmission service." Likewise, the Regional Tariff and membership agreement are designed to enable SPP to have operating control of transmission-owner members' facilities to

ensure service to support the overall functioning of SPP's transmission network. Under the membership agreement, a transmission-owner member of SPP "appoints SPP as its agent to provide service under the [Regional] Tariff over Tariff Facilities which it owns or controls," gives SPP authority to operate and control their transmission facilities "as necessary to provide service in accordance with the [Regional] Tariff," and must function in conformance with industry reliability practices, allowing SPP to monitor and control transmission operations in order to ensure the reliability of the SPP grid.

In this context, FERC could reasonably conclude that for SPP to be able to coordinate and control a large transmission system, being a "host zone" of SPP entails providing services that benefit SPP as a whole in that function. As a result, FERC could find that SPP's Regional Tariff includes a standard for transmission-owning members to qualify as a "host zone" that required East Texas to show that its transmission facilities would contribute to the overall functioning of the SPP system, i.e., the integration standard. This conclusion is consistent with the integration standard in the Regional Tariff for customer credits, *see Rehearing Order*, 98 F.E.R.C. at 61,109 n.33, itself based on the standard in Order No. 888 for customer credits. *See also Fla. Mun. Power*, 74 F.E.R.C. at 61,010 & n.48. Accordingly, FERC did not act arbitrarily in interpreting the Regional Tariff to require application of the integration test to East Texas.

## B.

East Texas contends, however, that even if the integration standard is appropriate, it is unduly discriminatory. According to East Texas, under the Regional Tariff large utilities that own transmission systems and that are already considered zone hosts are not required to make a showing of integration. FERC rejects the suggestion that its requirement is unduly discriminatory on the ground that it found

that East Texas was a transmission customer while the large utilities function as transmission providers, and maintains that its finding is supported by the record because the large transmission owners, unlike East Texas, have signed on as members to the SPP system under the Regional Tariff and therefore by definition are integrated into SPP's system. East Texas maintains that this is a post hoc argument because FERC never suggested in its Orders that East Texas could become a pricing "host zone" merely by signing SPP's membership agreement as a transmission owner, and further, that signing the membership agreement does not guarantee a utility will be treated as a transmission owner that has a designated pricing "host zone."

FERC's conclusion that "the large transmission owners currently provide grid transmission service" and that, therefore, there is no discriminatory treatment of East Texas by SPP is reasonable. *Initial Order*, 89 F.E.R.C. at 61,890. The large owners are members of SPP who operate under the Regional Tariff, and East Texas does not dispute that they allow SPP to use their facilities to provide open access transmission service on both a point-to-point and network basis. Given the nature of the services provided by these utilities as host zones of SPP, which entails providing transmission service that benefits SPP as a whole, FERC could reasonably conclude that the "large transmission owners function in SPP as transmission *providers*" and therefore met SPP's integration standard. *Rehearing Order*, 98 F.E.R.C. at 61,109. Indeed, this appears to be the import of FERC's decision in *SPP, Inc.*, 82 F.E.R.C. at 62,049–50 & n.2, on point-to-point service under the Regional Tariff. Moreover, contrary to East Texas's position, FERC's decision here does not unfairly benefit "large" owners over "small" owners; SPP transmission owners include a city, a district, other cooperatives, a federal power administration as well as utilities, 98 FERC at 61,103 n.1 and there is a wide range in the annual revenue requirements of these owners, suggesting a range in sizes of the owners.

## C.

In rejecting East Texas's claim that its facilities are integrated with SPP's transmission system, however, FERC failed to provide a valid basis for its "finding" that East Texas's facilities are "not integrated with any SPP transmission provider." *Rehearing Order*, 98 F.E.R.C. at 61,110. In its *Rehearing Order*, FERC did not make any findings, but instead referred to "earlier findings" in its *Initial Order*. *Id.* Those "earlier findings" do not appear in the *Initial Order*, which instead deferred to Docket EL98–66–000 on the issue of integration. 89 F.E.R.C. at 61,890–91. Given the lack of both actual findings by FERC and any statement in the Orders concerning the grounds to support a finding regarding integration, a remand is required. Considerations mentioned in FERC's brief but not in its Orders do not suffice to support its findings. *See Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69 (1962); *Mo. Pub. Serv. Comm'n*, 215 F.3d at 7. Unlike *Pacific Gas*, which FERC relies upon, a remand is required not because FERC erred in deciding whether to hold an evidentiary hearing, 306 F.3d at 1119, but because FERC failed to articulate any support in its Orders for its factual findings.

Accordingly, we grant the petition for the purpose of remanding the case on the issue of whether East Texas facilities within the SPP pool area are integrated with SPP's transmission system; we otherwise deny the petition. On remand, FERC may consider the findings in Docket EL98–66–000, *East Texas Cooperative, Inc. v. Central and South West Services, Inc.*, 89 F.E.R.C. ¶ 63,005 (1999), where East Texas sought credits for facilities, and may or may not conduct a hearing on the issue, as needed.