2011 OK CIV APP 1

**OKLAHOMA GAS AND ELECTRIC COMPANY, an Oklahoma corporation, Plaintiff/Appellee,**

v.

**Gerald A. BEECHER and Lucy Beecher, husband and wife, Defendants/Appellants,**

and

**Board of County Commissioners of Kingfisher County, a body corporate and politic; and Karen Mueggenborg, Kingfisher County Treasurer, Defendants.**

**Nos. 107,839, 107,647, 107,648, 107,649, 107,650, 107,651.**

Court of Civil Appeals of Oklahoma, Division No. 4.

Oct. 19, 2010.

Certiorari Denied Jan. 12, 2011.

Dennis R. Box, Paul Lefebvre, Audrey D. Blank, Michael D. O'Neal, David M. Box, Williams, Box, Forshee and Bullard, P.C., Oklahoma City, OK, for Plaintiff/Appellee.

Henry A. Meyer, III, Meyer & Leonard, PLLC, Oklahoma City, OK, and Robert G. Gum, Gum, Puckett & MacKechnie, L.L.P., Oklahoma City, OK, and Micheal L. Darrah,

E. Edd Prichett, Jr., Durbin, Larimore & Bialick, Oklahoma City, OK, for Defendants/Appellants.

DOUG GABBARD II, Presiding Judge.

¶ 1 This is one of six eminent domain appeals in which Plaintiff, Oklahoma Gas and Electric Company (OG & E), seeks to condemn easements for construction of electrical transmission lines to wind farms in northwestern Oklahoma. The appeals were made companion cases by the Supreme Court, and we simultaneously issue a decision in each appeal. In the present case, Defendants, Gerald A. Beecher and Lucy Beecher (Landowners), appeal the trial court's denial of Landowners' exception to the Report of Commissioners. We affirm.

## BACKGROUND

¶ 2 OG & E is an Oklahoma public utility that generates, transmits, and furnishes electric power to approximately 750,000 customers in Oklahoma and Arkansas. In 2007, OG & E began work on the "Transmission Line Project," a $218 million plan to transmit large amounts of wind-generated electricity through high capacity transmission lines (the Project). The Project is designed to consist of a 200–foot wide right-of-way running 121 miles across six Oklahoma counties, from Woodward to Oklahoma City. On this right-of-way, a series of 200–foot tall steel poles will be placed to support the transmission lines. The right-of-way will also have enough space for a second set of poles and lines, if needed.

¶ 3 The Oklahoma Corporation Commission (OCC) approved the Project as being "in the public interest," and authorized OG & E to pass along the Project's costs to its customers. The Southwest Power Pool (SPP) also approved the Project. SPP is one of several Regional Transmission Organizations throughout the U.S. It is regulated by the Federal Energy Regulatory Commission (FERC) and was created to coordinate and ensure the reliability of electricity transmission across a multistate area (also known as "the transmission grid") pursuant to a regional tariff. *East Texas Elec. Coop., Inc. v.*

*Fed. Energy Reg. Comm'n*, 331 F.3d 131 (D.C.Cir.2003). By contract with its members, SPP approves construction of new transmission lines, determines which entities may connect to those lines, decides whether to defer service to members until necessary line improvements are made, collects FERC tariffs on wholesale electricity transactions, and reimburses the appropriate owner of the transmission line utilized in the transaction. OG & E is a member of SPP.

¶ 4 OG & E began acquiring the necessary right of way, which included a portion of Landowners' property. On February 19, 2009, after negotiations with Landowners failed, OG & E filed a condemnation action seeking a permanent easement over Landowners' property. The court-appointed Commissioners determined that Landowners' damage was $31,420. Landowners filed both a demand for jury trial and an exception to the Commissioners' Report, asserting the taking was for an unauthorized private use, and not a public use.

¶ 5 At the hearing on Landowners' exception, OG & E introduced its Resolution of Necessity.[1] It also introduced evidence that the Project arose as a result of growing demand by Oklahoma consumers, OCC's refusal to allow OG & E to pass along the cost of a new coal-fired generating plant to consumers, and the likely passage of federal laws mandating the use of renewable energy sources such as wind power.[2] An OG & E official testified that while its customers would probably need an additional 640 megawatts of electricity capacity through 2020, each of the two proposed lines would hold 1,800 megawatts of electricity and the extra capacity had been included because SPP de-

termined it was needed. He also testified that several wind-generated electricity producers had already requested access to the lines. Finally, although OG & E had proposed construction of the Project, had determined the route, and would own the line, it admitted that the use of the line would be controlled by SPP. In this regard, OG & E Vice–President Paul Renfrow testified in his deposition:

A. . . . We build it. OG & E's interest in it is building it and to bring power to OG & E's customers. That's our role in this. But once you build it, again, we even have to pay to use that line once it's built. It's governed by the Southwest Power Pool. And so other independent power producers, if they decide they want to sell to OG & E's customers or some other utility, they have to get the power up there some way. And they would use these power lines, and then they would do it through the SPP.

. . .

Q. All right. Who controls whether electricity can be shipped on the proposed transmission line?

A. Southwest Power Pool.

Q. Is it possible for Southwest Power Pool to deny OG & E transmission rights along that power line?

A. Yes.

▪ ¶ 6 After considering the matter, the court found that OG & E's proposed easement was for a public purpose, but stated that Landowners had presented "compelling evidence" that the taking *also* included a private purpose. The trial court denied Landowners' exception, and they now appeal.[3]

---

1. Plaintiff's Exhibits 5 and 6.

2. OG & E asserts that 25 states have already passed similar legislation.

3. The fact that a jury trial on damages was requested and is pending is not fatal to this appeal. In condemnation cases, a trial court's ruling on exceptions to a commissioners' report is an appealable order, even where a jury trial on the issue of the value of the taking has yet to occur. *State ex rel. Bd. of Regents v. McCloskey Bros., Inc.*, 2009 OK 90, ¶ 11, 227 P.3d 133, 140; *State ex rel. Dep't of Transp. v. Mehta*, 2008 OK CIV APP 25, ¶ 21, 180 P.3d 1214, 1219. We note

that another division of this Court recently held, in *State ex rel. Department of Transportation v. Teal*, 2010 OK CIV APP 64, 238 P.3d 947 (cert. denied June 7, 2010), that an order denying an exception to a Commissioners' Report was not an appealable order where a demand for jury trial was pending. There, however, the exception centered on the appropriate measure of damages, not on whether the taking was for a public use. Where the right to take the property is the issue, as in the instant case, the trial court's ruling on the exception is subject to immediate appeal. *See Mehta*, 2008 OK CIV APP 25 at ¶ 21, 180 P.3d at 1219.

## STANDARD OF REVIEW

¶ 7 OG & E's statutory right to condemn property is found at 27 O.S.2001 § 7, which grants corporations that furnish light, heat, or power, by electricity or gas, the same power of eminent domain as is granted to railroads. *Pub. Serv. Co. v. Willis*, 2007 OK CIV APP 18, ¶¶ 10–11, 155 P.3d 845, 848 (approved for publication by the Oklahoma Supreme Court). Railroads are authorized to exercise the power of eminent domain by 66 O.S.2001 §§ 51 through 66. However, that procedure is subject to Sections 23 and 24 of Article II of the Oklahoma Constitution, providing that private property may only be taken by condemnation for a public use.[4] Section 24 provides that the question of whether a taking is for a public use is a judicial question.

¶ 8 When a condemning entity adopts a Resolution of Necessity declaring the necessity for condemning land for a public purpose, as OG & E did in this instance, the Resolution establishes "a prima facie case of necessity, and the burden then shift[s] to the defendant to show that such taking was not for a public use." *Delfeld v. City of Tulsa*, 1942 OK 402, ¶ 39, 131 P.2d 754, 761; *see also Okla. City v. Shadid*, 1966 OK 189, ¶ 3, 439 P.2d 190, 191. On appeal, we review factual issues by the any-competent-evidence standard. However, we review contested issues of law *de novo*. *Salve Regina College v. Russell*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991). Under the *de novo* standard, no deference is given to the trial court's legal ruling. *Neil Acquisition L.L.C. v. Wingrod Investment Corp.*, 1996 OK 125, n. 1, 932 P.2d 1100, 1103.[5]

## ANALYSIS

¶ 9 The facts of this case are straightforward. OG & E seeks to condemn a portion of Landowners' property to construct part of a large-scale electric transmission project. The Project will serve OG & E's Oklahoma customers by providing them with electricity, both now and in the future. However, the Project may also serve consumers in other states who buy their electricity from private power companies having access to the lines. Moreover, the lines will be controlled, in part, by SPP. The issue is whether the proposed Project has a public purpose.

¶ 10 Since the early days of statehood, the Supreme Court has recognized that generating, storing, and transmitting electricity to those who need it is a public use for which the power of eminent domain may properly be granted to and exercised by electric utility companies. *Tuttle v. Jefferson Power & Improvement Co.*, 1912 OK 232, 122 P. 1102. Generally, OG & E has condemnation authority for that purpose.

¶ 11 Landowners assert in the instant case that OG & E's condemnation does not have a public purpose for two reasons. First, they argue that most of the Project's electric transmission capacity will be used by customers outside of Oklahoma who are not Oklahoma citizens. Second, Landowners contend that SPP will have actual control of the line.

¶ 12 On the first issue, Landowners assert that OG & E's customers are not the primary beneficiaries of the taking because only about 22 percent of the Project's capacity will be needed to meet customer demands through 2020. Landowners then conclude that 78 percent of the Project's capacity will be used to transmit electricity to out-of-state customers, and, therefore, the condemnation fails

4. Article II, § 23 provides:
No private property shall be taken or damaged for private use, with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.
Section 24 provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."
We use the terms "public purposes" and "public use" interchangeably. *See* William J. Appel,

Annotation, *Eminent Domain: Industrial Park or Similar Development as Public Use Justifying Condemnation of Private Property*, 62 A.L.R.4th 1183, n.5 (1988).

5. We reject OG & E's argument that our standard of review is the any-competent-evidence standard. That standard is applied where the question is whether the taking is necessary. The issue in this case is not the necessity of the taking, but its nature.

the "primary beneficiary" test set forth in *Board of County Commissioners v. Lowery,* 2006 OK 31, 136 P.3d 639.

¶ 13 In *Lowery,* Muskogee County attempted to condemn an easement across private property for water lines that would serve Energetix, a privately owned electricity generation plant. Although it lacked specific statutory authority to condemn the property for that purpose, the county argued that the general economic benefits of the project to the community qualified as a public purpose. The trial court agreed and confirmed the takings, but the Oklahoma Supreme Court reversed. In doing so, the Court noted that the U.S. Supreme Court, in *Kelo v. City of New London,* 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), had held that a city may condemn private property for the public purpose of economic development without violating the Fifth Amendment's Takings Clause prohibiting the taking of private property for public use without just compensation. *Lowery,* 2006 OK 31 at ¶ 15, 136 P.3d at 649. However, the *Lowery* Court distinguished *Kelo* by noting that Connecticut law authorized the use of eminent domain as part of an economic development project whereas Oklahoma law did not. *Id.* at ¶ 18, 136 P.3d at 650. More importantly, the Court noted that Sections 23 and 24 of Article II of the Oklahoma Constitution limits condemnations to public purposes, and Section 23 specifically prohibits the taking of property "for private use." *Id.* at ¶ 20, 136 P.3d at 652. The Court stated that it construed this latter prohibition narrowly, and concluded that Sections 23 and 24 give greater protection to private property than the Constitution of the United States. *Id.* at ¶ 19, 136 P.3d at 651. *Lowery* held that economic development alone, in the absence of blight removal, did not constitute a public purpose.

¶ 14 The *Lowery* Court also discussed the fact that Energetix had contractually agreed to construct an additional water line for Muskogee County Rural Water District No. 5, if the county completed the condemnation on

its behalf. In a lengthy footnote, the Court noted that while the additional water line would benefit rural residents, these residents were not "**the primary intended beneficiaries**" of the proposed taking. *Id.* at n. 14, 136 P.3d at 647 (emphasis added). In fact, the Water District line depended on the condition precedent that an easement for the private lines be obtained, thus amounting to an impermissible "cart before the horse" extension of the power of eminent domain.[6] *Id.*

■ ¶ 15 Applying the test from *Lowery* here, Landowners' argument fails for two reasons. First, even if OG & E's customers use only 22 percent of the electricity capacity of the line through 2020, Landowners did not present any evidence that the remaining 78 percent capacity would actually be used by out-of-state consumers, or that OG & E customers ultimately would not use most of the line capacity over the effective life of the Project (50 to 60 years). Second, the "primary intended beneficiaries" of the line are the customers of OG & E. These customers will benefit as end consumers of electricity, as well as by the availability of more reliable, efficient, and economical electricity because of regional control and tariff reimbursements by any out-of-state entities using the line.

¶ 16 *Lowery* does not hold that 51 percent of the electricity produced or transmitted as a result of a condemnation project by an electric company must be "used" by the Oklahoma public. Rather, the key factor is whether the primary intended beneficiary, considering *all* the factors in the case, is the Oklahoma public, and not private or out-of-state entities. In a sense, the Project is analogous to an Oklahoma interstate highway. The highway must be built according to federal standards and it may even be used by more out-of-state drivers of vehicles than Oklahoma citizens. Nevertheless, most would agree that the Oklahoma public is its primary beneficiary. In the case before us, the evidence shows that the primary beneficiaries of the Project are OG & E's Okla-

**6.** In a concurring opinion, Justice Opala suggested using a balancing test to determine whether the anticipated public benefits "substantially outweigh" the private character of the use. *Lowery,* 2006 OK 31, ¶ 4, 136 P.3d 639, 654 (Opala, J., concurring). In a separate concurrence, Justice Taylor stated that the test should be whether "the primary reason" for the taking is to serve a public purpose. *Id.* at ¶ 2, 136 P.3d at 655 (Taylor, J., concurring in result).

homa customers; and, therefore, Landowners' first argument fails.[7]

¶ 17 Next, Landowners argue that the public purpose requirement is not met because, while OG & E will construct and own the Project, SPP will control its use, and could "deny OG & E transmission rights along that power line."

¶ 18 In cases involving electrical power, the authority to condemn has been approved even where condemnation is sought by an intermediate agency that does not "control" its use, as long as the ultimate use is public. *See* 26 Am.Jur.2d *Eminent Domain* § 61 (1996). An example of this type of approved use in condemnations involving electric companies is found in *Dairyland Power Cooperative v. Brennan,* 248 Minn. 556, 82 N.W.2d 56 (1957). There, the condemning party was a nonprofit cooperative organized to furnish electricity at wholesale prices to member cooperatives, which then supplied electricity to retail consumers. In order to expand its service, the cooperative sought condemnation of a right-of-way easement for transmission lines. The Minnesota Supreme Court held:

> If the ultimate use is public, it is immaterial that condemnation is sought by an intermediate agency which is to distribute the electricity to independent lighting or power companies or by a company, organized to furnish electric power, to reach a source from which it will purchase electric current for distribution and resale to its customers.

> The operations of Dairyland should be viewed as a whole in the light of its func-

tions and relations to the member cooperatives who depend upon it for their supply of electric energy, and the fact that it does not directly come in contact with the ultimate consumer does not deprive it of its character as a public utility. Nor can we ignore the needs and interests of the thousands of consumers who rely upon Dairyland for the electrical energy they use.

*Id.* at 64 (citation and internal quotation marks omitted).

¶ 19 The importance of meeting "the needs and interests" of state citizens is likewise found in Oklahoma eminent domain cases. For example, as explained in footnote 7, in *Delfeld v. City of Tulsa,* the Supreme Court approved a condemnation as having a public purpose where the City of Tulsa intended to convey 300 acres of a 1,000–acre tract to the federal government for the construction of a wartime bomber assembly plant. Another example is *Isaacs v. Oklahoma City,* 1966 OK 267, 437 P.2d 229, where the Supreme Court allowed a condemnation for the purpose of blight removal even though the actual ownership of the land-and not just control-would be turned over to a private party. The Court found that the elimination of slums and blighted areas were a matter of public interest.

¶ 20 Reliable electric power is even more important to state citizens than slum and blight elimination. As early as 1912, the Oklahoma Supreme Court recognized that the public's need and demand for electricity is comparable to that for water. *Tuttle,* 1912

---

7. We disagree with OG & E's argument that the Oklahoma public need not be the primary intended beneficiary. In support, OG & E relies on *Tuttle v. Jefferson Power & Improvement Co.,* 1912 OK 232, 122 P. 1102; *McCrady v. Western Farmers Electric Cooperative,* 1958 OK 43, 323 P.2d 356; and *Sublett v. City of Tulsa,* 1965 OK 78, 405 P.2d 185; however, each of those cases involved a condemnation directly benefitting Oklahoma citizens. Language in both *Lowery* and *Delfeld v. City of Tulsa,* 1942 OK 402, 131 P.2d 754, supports the proposition that a condemnation is not for a public purpose where the primary intended beneficiary would be out-of-state citizens. In *Delfeld,* the City of Tulsa sought to condemn 1,000 acres to both expand its municipal airport *and* to deed 300 of the acres

to the federal government for the purpose of constructing a bomber assembly plant. Although the majority of the land was to be used for the benefit of Tulsa citizens, the Supreme Court stressed that the taking for the federal government benefitted all states, including Oklahoma and its citizens, and, therefore, had a public purpose. Similarly, in *Lowery,* the Court not only disapproved the condemnation because it was for a private use, but also because in-state consumers would not be benefitted: "[W]e are unable to discern whether the furnished electricity product will ultimately be offered to the public at large and/or whether such product will ultimately be sold out-of-state." 2006 OK 31, n. 15, 136 P.3d at 648.

OK 232 at ¶ 6, 122 P. at 1103. OG & E is a public utility that supplies electricity to a large number of Oklahoma consumers. SPP is part of a system that seeks to ensure "the establishment of efficient and reliable markets throughout the region, while preventing undue discrimination or preference in the provision of electric transmission services." *Southwest Power Pool, Inc.*, 109 FERC P 61010 ¶ 2, 2004 WL 2213020 (Order on Rehearing, Oct. 1, 2004). Although SPP will control access to the transmission lines of OG & E and other electric companies in its multistate region, nothing in the record suggests that OG & E will not have that access, or that its present condemnation is a pretext for benefitting out-of-state entities. The fact that out-of-state entities may also benefit is not a bar to the present condemnation.

¶ 21 For all these reasons, we find no support for Landowners' argument that SPP's control over the Project destroys the public purpose behind the condemnation, especially given Oklahoma's long-standing and consistent policy favoring the availability of electric power for the use and enjoyment of state citizens.

## CONCLUSION

¶ 22 Accordingly, the trial court's decision denying Landowners' exception to the Report of Commissioners is affirmed.

¶ 23 AFFIRMED.

GOODMAN, J., concurs, and RAPP, J., not participating.