2015 OK CIV APP 57

**CITY OF MUSKOGEE, Oklahoma, A Municipal Corporation, Plaintiff/Appellee,**

v̇.

**Catherine M. PHILLIPS, a/k/a Catherine Masterson and Orlin Phillips, Defendants/Appellants,**

and

**Muskogee County Treasurer; Board of County Commissioners of Muskogee County, Oklahoma; Eastside Boulevard, L.L.C.; Floyd Harjo; Hilly Harjo, Defendants.**

**No. 111,501.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Nov. 21, 2014.

Rehearing Denied Feb. 5, 2015.

Certiorari Denied May 26, 2015.

Matthew C. Beese, Muskogee, Oklahoma, for Plaintiff/Appellee.

David E. Anderson, Miami, Oklahoma, for Defendants/Appellants.

BAY MITCHELL, Judge:

¶1 This is a condemnation action initiated by the City of Muskogee ("Muskogee") against property owners, Defendants/Appellants Catherine Phillips and Orlin Phillips ("Property Owners"). Property Owners appeal from the trial court's Order overruling Defendants' exceptions to the Muskogee County Commissioners' Report in favor of Muskogee.[1]

¶2 In January 2012, Muskogee passed and adopted Resolution No. 2385 ("the Resolution") declaring the necessity for acquiring five parcels including private residential property for the construction of a parking facility described therein as a public utility pursuant to *In re Application of Southern Oklahoma Development Trust*, 470 P.2d 572. The Resolution provided "said parking facility is needed for the health and safety of the Citizen's [sic] of Muskogee by reducing the volume of on-street parking in the areas near and surrounding [public ways: North "G" Street; North "F" Street; East Broadway; and, Callahan Street]." The Resolution authorized acquisition of the subject properties by purchase or if they cannot be purchased, by condemnation proceedings. The Resolution further called for the parking facility to be constructed, maintained and operated through a leasehold estate with the Muskogee Parking Authority, a public trust.

¶3 The married Property Owners are the record owners of two parcels subject to the Resolution: a vacant lot and the residential property located at 211 North G Street.[2]

---

1. An order adjudicating a right to condemn is appealable pursuant to 12 O.S. § 952(b)(1) as a final order. *McMillian v. Holcomb*, 1995 OK 117, ¶3, 907 P.2d 1034, 1035–36.

2. Property Owners' house was built in approximately 1935 and has 896 square feet of living space.

They have lived there together over 20 years and Mrs. Phillips had lived in that house (before they were married) for over 40 years. In accordance with the authorization provided in the Resolution, the properties were appraised and The City Manager attempted to negotiate for the purchase of the subject properties.[3]

¶ 4 After the attempts to purchase the properties failed, Muskogee filed the instant action in June 2012, seeking to acquire the properties by condemnation. The Resolution and an affidavit declaring the necessity of the acquisition were attached as exhibits to the condemnation Petition. The Affidavit of Necessity, executed by Muskogee's Director of Public Works, provides in pertinent part as follows:

> In order to economically implement the City project known as the "VA Parking Project 2012" pursuant to City Council Resolution NO. 2385, it is necessary to acquire all the property needed to build a parking lot from and including the areas between North "F" and "G" Streets and Callahan and East Broadway. The real property subject to this suit is within this described area.... As such, the City has determined that a public necessity exists for the acquisition of the real property subject to this suit.

¶ 5 After proper appointment of Commissioners and the August 2012 filing of the Report of Commissioners, Property Owners timely filed their Exceptions to same.[4] Their primary objection was on the basis that the purported exercise of eminent domain was for an improper private purpose and not necessary for a lawful public purpose. Additionally, they asserted the Commissioners' Report suggests the taking was for the purpose of economic development, which is not a public purpose to justify the exercise of eminent domain.

¶ 6 Muskogee responded with the filing of a brief in opposition to Property Owners' Exceptions and an Application for a Writ of Assistance. It sought to condemn the properties pursuant to 11 O.S. § 22–104(2) and (3), which provides "Every municipality shall have the right to ... acquire, own, and maintain ... real estate for sites and rights-of-way for any municipal purpose including but not limited to public utility and public park purposes" and "exercise the right of eminent domain for any municipal purpose." *Id.* Muskogee essentially asserted the proposed parking facility is a public utility for which it may lawfully exercise its eminent domain power.

¶ 7 Subsequent to an evidentiary hearing, the trial court ultimately determined the principal purpose of the taking was a public purpose (while noting "there may be some tangential private benefits gained by individuals or private entities") and therefore overruled Property Owners' Exceptions to the Commissioners' Report.[5] Property Owners appeal.

¶ 8 We are guided by the Oklahoma Constitution concerning the taking of private property. Article 2, § 23 provides as follows:

> **No private property shall be taken or damaged for private use,** with or without compensation, unless by consent of the owner, except for private ways of necessity, or for drains and ditches across lands of others for agricultural, mining, or sanitary purposes, in such manner as may be prescribed by law.

OKLA. CONST. Art. 2, § 23 (emphasis added). Our Constitution further generally provides "private property shall not be taken or damaged for public use without just compensation." OKLA. CONST. Art. 2, § 24. That constitutional provision additionally states "[in] all cases of condemnation of private property for public or private use, the determination of the character of the use shall be a judicial question." *Id.*[6] The law is clear

---

3. Muskogee offered Property Owners the appraised values of $32,500 to purchase the residential property and $1,200 for the lot.

4. Property Owners did not designate the Report of Commissioners for inclusion in the record on appeal. Thus, we are unable to review its contents.

5. The trial court refrained from ruling on Muskogee's Application for a Writ of Assistance.

6. A "judicial question" is a question of law, which on appeal is reviewed *de novo. Okla. Gas & Elec. Co. v. Beecher,* 2011 OK CIV APP 1, ¶¶ 7–8, 256 P.3d 1008, 1011.

that "[p]rivate property may not be taken or damaged by the condemning agency unless the taking or damage is necessary for the accomplishment of a lawful public purpose." *Luccock v. City of Norman*, 1978 OK 66, 578 P.2d 1204, 1206 (citing Art. 2, §§ 23 & 24 of the Oklahoma Constitution). *Luccock* demonstrates that we have used the terms "public use" and "public purpose" interchangeably in our analysis of our state constitutional eminent domain provisions, and we therefore view these terms as synonymous. *Id.*

¶ 9 As a general rule, we construe our state constitutional eminent domain provisions "strictly in favor of the owner and against the condemning party." *Board of County Comm'rs of Muskogee County v. Lowery*, 2006 OK 31, 136 P.3d 639 (citation omitted). We additionally strictly construe eminent domain statutes. *Id.* As noted in *Lowery*, we adhere to a narrow construction of "public purpose" in the context of eminent domain cases (as opposed to a broader construction of that term in the context of public funding) as the power of eminent domain should be exercised with restraint. *Id.* at ¶ 11.

¶ 10 Evidence presented at the evidentiary hearing demonstrates the Property Owners' property is in close proximity to 800 East Okmulgee, the location of a commercial office building owned by Eastside Boulevard, L.L.C. ("Landlord"). Landlord leases its building to its tenant, GSA/VA Benefits, which operates a call center out of the facility. The number of employees working in that facility has increased in recent years. Although the facility has an on-site parking lot, VA employees were regularly parallel parking (often on both sides) on several nearby residential streets.

¶ 11 Muskogee officials testified the parking congestion on the residential streets surrounding the VA building created a safety hazard because emergency responders would have difficulty traveling the streets and/or accessing fire hydrants due to the number of cars parked on both sides of the road and/or in such a way as to block access to the hydrants. The VA parking project was designed to alleviate the parking demands within the neighborhood and thereby serve the public.

¶ 12 The record includes a contract executed in June 2012 entitled "Shared Parking Agreement Between the City of Muskogee and Eastside Boulevard, L.L.C." This contract provides for Landlord's agreement to donate seven parcels of property in the subject area to the Muskogee Parking Authority to be held in its name. In consideration for the contract, the contract further notes Landlord's plan for expansion of the VA building "by approximately 13,311 square feet for the future benefit of the GSA/VA Benefits." Muskogee and the Muskogee Parking Authority agreed to construct and maintain a parking facility with a minimum of 200 spaces in accordance with the Resolution. Finally, the contract contained the following express agreement: "The City of Muskogee and the Muskogee Parking Authority **agree to lease the parking spaces to VA Benefits employees first before they are offered to the public.**" (Emphasis added).

¶ 13 City Manager James Buckley testified the parking "congestion problem is a direct relation to the employees parking on the street." He further testified that under the terms of the Shared Parking Agreement, if the VA Benefits employees wanted to lease all of the parking spaces in the proposed parking facility, they could.

¶ 14 Based upon the facts and circumstances herein, we find the parking facility at issue herein cannot be construed as a public utility as it was designed and established primarily for the purpose of serving a private entity and/or employees of that entity's tenant.[7] *See Lowery*, 2006 OK 31, n. 15, 136 P.3d

---

7. Muskogee cannot avoid constitutional restrictions on the power of eminent domain by merely labeling the proposed parking facility as a public utility. The purpose and use behind the exercise of eminent domain-here the purpose and use of the parking facility—must be analyzed to discern if it passes constitutional muster. *See, e.g., City & County of San Francisco v. Ross*, 44 Cal.2d 52, 279 P.2d 529, 533 (1955) (rejecting the argument that the provision of off-street parking facilities at a reasonable rate regardless of ownership and primary purpose of operation *ipso facto* serves a public purpose); *Shizas v. City of Detroit*, 333 Mich. 44, 52 N.W.2d 589 (1952) (holding statute

639 (finding the private electric company was not a public utility on the basis of the absence of evidence in the record that the company "plan[ned] to supply power or electricity to members of the public who need it upon equal and reasonable terms."). Muskogee's reliance on *In re Application of Southern Oklahoma Development Trust,* 1970 OK 118, 470 P.2d 572, in support of its assertion that the parking facility is a public utility is misplaced, particularly considering the fact that case was not in the context of eminent domain, but rather, bond issuance (with focus on public *economic* benefits sought by means of the parking facility therein). *Id.* at 574. *Lowery* clearly provides that in the context of eminent domain, economic development alone (not in connection with the removal of blighted property) does not constitute a public use or public purpose to justify the exercise of eminent domain as a matter of Oklahoma constitutional law. *Lowery,* 2006 OK 31, ¶ 0, 136 P.3d 639;[8] *see supra discussion at ¶ 9.*

¶ 15 Further, insomuch as we find the proposed parking facility is primarily dedicated to serving the VA Benefits employees and/or Landlord in providing an off-site parking facility for its tenant, the taking of private property for such private purpose is constitutionally impermissible. The private character of the purpose behind the parking facility is particularly illuminated within the contractual provisions of the Shared Parking Agreement, which expressly designate that the employees be offered the parking spots before they are open to the public.[9] In fact, depending upon the number of VA Benefits employees to accompany the planned expansion of the building, the parking spots may never be offered to any member of the public. Additionally, the agreement expressly provides it "is in perpetuity and can only be terminated if comparable, replacement parking has been provided for the benefit of the GSA/VA Benefits employees...." While the reduction in the number of employees parallel parking in the adjacent residential streets may provide an *indirect public benefit* by allowing for easier passage and flow of traffic thereon during certain times of the day, this public benefit is too attenuated to fall within our strict constitutional confines of "public

providing for condemnation of property to be used in part for off-street parking facilities and in part for rental for private business void for failure to satisfy the public purpose test); *Reel v. City of Freeport,* 61 Ill.App.2d 448, 209 N.E.2d 675 (1965) (reversing dismissal on the basis of allegations that defendant city conspired with other defendants to sell to defendant department store an existing parking lot for private use and thereafter take plaintiff's property to replace such parking facility for purported public use); *City of Austin v. Whittington,* 55 Tex. Sup.Ct. J. 1245, 384 S.W.3d 766 (2012) (concluding that parking garage was a "public building" where it was open to the public and the primary purpose of the garage was to support an expanded convention center legislatively considered a public use supportive of the city's condemnation of privately owned land necessary for such use); *Rhode Island Economic Development Corp. v. The Parking Co., L.P.,* 892 A.2d 87 (holding where condemnation of a temporary easement in an airport parking garage was primarily designed for economic benefit to gain control of the garage at a discounted price, the taking was not for public use and therefore was an unconstitutional taking).

8. Muskogee attempts to distinguish *Lowery* on the basis that economic development (*i.e.,* increased taxes, jobs and public and private investment in the community) was not its stated purpose behind its instant condemnation quest.

While we refrain from making a determination on whether the *de facto* purpose behind the taking herein was for economic development purposes, we nevertheless find the principle holding in *Lowery* (that the taking of private property to confer a private benefit on a private party is unconstitutional) applicable to the taking herein regardless of the parties' characterizations of its purpose.

9. In *Lowery,* the private electric company had a contract with the water district wherein the electric company had agreed to construct a water pipeline beneficial to the public on the condition precedent of the company's success in acquiring the rights-of-way for two private pipelines intended solely to serve the private company. *Lowery,* 2006 OK 31, n. 14, 136 P.3d 639. "If we were to find the public purpose test satisfied on these facts, we would essentially be first permitting the taking of private property for a private use in order to give rise to a private, non-party's contractual obligation to construct a pipeline that would ultimately satisfy the public purposes requirement." *Id.* Just as in *Lowery,* our determination of "public purpose" here is constrained by the terms of a contract, which may never give rise to public use/purpose unless and until the contractual obligatory first offering of parking spaces to private third-party beneficiaries.

purpose" to permit a municipality's exercise of eminent domain.

¶16 Insomuch as we find Muskogee's condemnation of Property Owners' private property was for an impermissible private purpose, the trial court erred in its Order overruling Property Owners' Exceptions to the Report of the Commissioners. Property Owners' brief includes a Motion for appeal-related attorney fees. This motion is denied without prejudice to the filing of a separate motion in compliance with Supreme Court Rule 1.14(B).

¶17 REVERSED.

BELL, P.J., and GOREE, J., concur.